CONNICK, DISTRICT ATTORNEY IN AND FOR THE
PARISH OF ORLEANS, LOUISIANA *v.* MYERS

No. 81–1251.   Argued November 8, 1982—Decided April 20, 1983

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and POWELL, REHNQUIST, and O'CONNOR, JJ., joined. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, BLACKMUN, and STEVENS, JJ., joined, *post*, p. 156.

*William F. Wessel* argued the cause for petitioner. With him on the brief was *Victoria Lennox Bartels*.

*George M. Strickler, Jr.*, argued the cause for respondent. With him on the brief were *Ann Woolhandler* and *Michael G. Collins.**

---

*Briefs of *amici curiae* urging affirmance were filed by *Mark C. Rosenblum, Nadine Strossen*, and *Charles S. Sims* for the American Civil Liberties Union et al.; and by *Robert H. Chanin, Laurence Gold*, and *Marsha S. Berzon* for the National Education Association et al.

JUSTICE WHITE delivered the opinion of the Court.

In *Pickering* v. *Board of Education*, 391 U. S. 563 (1968), we stated that a public employee does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment. We also recognized that the State's interests as an employer in regulating the speech of its employees "differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Id.*, at 568. The problem, we thought, was arriving "at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Ibid.* We return to this problem today and consider whether the First and Fourteenth Amendments prevent the discharge of a state employee for circulating a questionnaire concerning internal office affairs.

## I

The respondent, Sheila Myers, was employed as an Assistant District Attorney in New Orleans for five and a half years. She served at the pleasure of petitioner Harry Connick, the District Attorney for Orleans Parish. During this period Myers competently performed her responsibilities of trying criminal cases.

In the early part of October 1980, Myers was informed that she would be transferred to prosecute cases in a different section of the criminal court. Myers was strongly opposed to the proposed transfer[1] and expressed her view to several of her supervisors, including Connick. Despite her objections, on October 6 Myers was notified that she was being trans-

---

[1] Myers' opposition was at least partially attributable to her concern that a conflict of interest would have been created by the transfer because of her participation in a counseling program for convicted defendants released on probation in the section of the criminal court to which she was to be assigned.

ferred. Myers again spoke with Dennis Waldron, one of the First Assistant District Attorneys, expressing her reluctance to accept the transfer. A number of other office matters were discussed and Myers later testified that, in response to Waldron's suggestion that her concerns were not shared by others in the office, she informed him that she would do some research on the matter.

That night Myers prepared a questionnaire soliciting the views of her fellow staff members concerning office transfer policy, office morale, the need for a grievance committee, the level of confidence in supervisors, and whether employees felt pressured to work in political campaigns.[2] Early the following morning, Myers typed and copied the questionnaire. She also met with Connick who urged her to accept the transfer. She said she would "consider" it. Connick then left the office. Myers then distributed the questionnaire to 15 Assistant District Attorneys. Shortly after noon, Dennis Waldron learned that Myers was distributing the survey. He immediately phoned Connick and informed him that Myers was creating a "mini-insurrection" within the office. Connick returned to the office and told Myers that she was being terminated because of her refusal to accept the transfer. She was also told that her distribution of the questionnaire was considered an act of insubordination. Connick particularly objected to the question which inquired whether employees "had confidence in and would rely on the word" of various superiors in the office, and to a question concerning pressure to work in political campaigns which he felt would be damaging if discovered by the press.

Myers filed suit under 42 U. S. C. § 1983 (1976 ed., Supp. V), contending that her employment was wrongfully terminated because she had exercised her constitutionally protected right of free speech. The District Court agreed, ordered Myers reinstated, and awarded backpay, damages, and

---

[2] The questionnaire is reproduced as an Appendix to this opinion.

attorney's fees.    507 F. Supp. 752 (ED La. 1981).[3]   The District Court found that although Connick informed Myers that she was being fired because of her refusal to accept a transfer, the facts showed that the questionnaire was the real reason for her termination.    The court then proceeded to hold that Myers' questionnaire involved matters of public concern and that the State had not "clearly demonstrated" that the survey "substantially interfered" with the operations of the District Attorney's office.

Connick appealed to the United States Court of Appeals for the Fifth Circuit, which affirmed on the basis of the District Court's opinion.    654 F. 2d 719 (1981).   Connick then sought review in this Court by way of certiorari, which we granted.    455 U. S. 999 (1982).

## II

For at least 15 years, it has been settled that a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression.   *Keyishian* v. *Board of Regents*, 385 U. S. 589, 605–606 (1967); *Pickering* v. *Board of Education*, 391 U. S. 563 (1968); *Perry* v. *Sindermann*, 408 U. S. 593, 597 (1972); *Branti* v. *Finkel*, 445 U. S. 507, 515–516 (1980).   Our task, as we defined it in *Pickering*, is to seek "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."   391 U. S., at 568. The District Court, and thus the Court of Appeals as well, misapplied our decision in *Pickering* and consequently, in our view, erred in striking the balance for respondent.

---

[3] Petitioner has also objected to the assessment of damages as being in violation of the Eleventh Amendment and to the award of attorney's fees. Because of our disposition of the case, we do not reach these questions.

## A

The District Court got off on the wrong foot in this case by initially finding that, "[t]aken as a whole, the issues presented in the questionnaire relate to the effective functioning of the District Attorney's Office and are matters of public importance and concern." 507 F. Supp., at 758. Connick contends at the outset that no balancing of interests is required in this case because Myers' questionnaire concerned only internal office matters and that such speech is not upon a matter of "public concern," as the term was used in *Pickering*. Although we do not agree that Myers' communication in this case was wholly without First Amendment protection, there is much force to Connick's submission. The repeated emphasis in *Pickering* on the right of a public employee "as a citizen, in commenting upon matters of public concern," was not accidental. This language, reiterated in all of *Pickering*'s progeny,[4] reflects both the historical evolvement of the rights of public employees, and the common-sense realization that government offices could not function if every employment decision became a constitutional matter.[5]

For most of this century, the unchallenged dogma was that a public employee had no right to object to conditions placed upon the terms of employment—including those which restricted the exercise of constitutional rights. The classic formulation of this position was that of Justice Holmes, who, when sitting on the Supreme Judicial Court of Massachusetts, observed: "[A policeman] may have a constitutional

---

[4] See *Perry* v. *Sindermann*, 408 U. S. 593, 598 (1972); *Mt. Healthy City Board of Ed.* v. *Doyle*, 429 U. S. 274, 284 (1977); *Givhan* v. *Western Line Consolidated School District*, 439 U. S. 410, 414 (1979).

[5] The question of whether expression is of a kind that is of legitimate concern to the public is also the standard in determining whether a common-law action for invasion of privacy is present. See Restatement (Second) of Torts § 652D (1977). See also *Cox Broadcasting Corp.* v. *Cohn*, 420 U. S. 469 (1975) (action for invasion of privacy cannot be maintained when the subject matter of the publicity is matter of public record); *Time, Inc.* v. *Hill*, 385 U. S. 374, 387–388 (1967).

right to talk politics, but he has no constitutional right to be a policeman." *McAuliffe* v. *Mayor of New Bedford*, 155 Mass. 216, 220, 29 N. E. 517, 517 (1892). For many years, Holmes' epigram expressed this Court's law. *Adler* v. *Board of Education*, 342 U. S. 485 (1952); *Garner* v. *Los Angeles Bd. of Public Works*, 341 U. S. 716 (1951); *Public Workers* v. *Mitchell*, 330 U. S. 75 (1947); *United States* v. *Wurzbach*, 280 U. S. 396 (1930); *Ex parte Curtis*, 106 U. S. 371 (1882).

The Court cast new light on the matter in a series of cases arising from the widespread efforts in the 1950's and early 1960's to require public employees, particularly teachers, to swear oaths of loyalty to the State and reveal the groups with which they associated. In *Wiemann* v. *Updegraff*, 344 U. S. 183 (1952), the Court held that a State could not require its employees to establish their loyalty by extracting an oath denying past affiliation with Communists. In *Cafeteria Workers* v. *McElroy*, 367 U. S. 886 (1961), the Court recognized that the government could not deny employment because of previous membership in a particular party. See also *Shelton* v. *Tucker*, 364 U. S. 479, 490 (1960); *Torcaso* v. *Watkins*, 367 U. S. 488 (1961); *Cramp* v. *Board of Public Instruction*, 368 U. S. 278 (1961). By the time *Sherbert* v. *Verner*, 374 U. S. 398 (1963), was decided, it was already "too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege." *Id.*, at 404. It was therefore no surprise when in *Keyishian* v. *Board of Regents*, *supra*, the Court invalidated New York statutes barring employment on the basis of membership in "subversive" organizations, observing that the theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, had been uniformly rejected. *Id.*, at 605–606.

In all of these cases, the precedents in which *Pickering* is rooted, the invalidated statutes and actions sought to suppress the rights of public employees to participate in public

affairs. The issue was whether government employees could be prevented or "chilled" by the fear of discharge from joining political parties and other associations that certain public officials might find "subversive." The explanation for the Constitution's special concern with threats to the right of citizens to participate in political affairs is no mystery. The First Amendment "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Roth* v. *United States*, 354 U. S. 476, 484 (1957); *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 269 (1964). "[S]peech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison* v. *Louisiana*, 379 U. S. 64, 74–75 (1964). Accordingly, the Court has frequently reaffirmed that speech on public issues occupies the " 'highest rung of the heirarchy of First Amendment values,' " and is entitled to special protection. *NAACP* v. *Claiborne Hardware Co.*, 458 U. S. 886, 913 (1982); *Carey* v. *Brown*, 447 U. S. 455, 467 (1980).

*Pickering* v. *Board of Education*, *supra*, followed from this understanding of the First Amendment. In *Pickering*, the Court held impermissible under the First Amendment the dismissal of a high school teacher for openly criticizing the Board of Education on its allocation of school funds between athletics and education and its methods of informing taxpayers about the need for additional revenue. *Pickering*'s subject was "a matter of legitimate public concern" upon which "free and open debate is vital to informed decision-making by the electorate." 391 U. S. at 571–572.

Our cases following *Pickering* also involved safeguarding speech on matters of public concern. The controversy in *Perry* v. *Sindermann*, 408 U. S. 593 (1972), arose from the failure to rehire a teacher in the state college system who had testified before committees of the Texas Legislature and had become involved in public disagreement over whether the college should be elevated to 4-year status—a change opposed by the Regents. In *Mt. Healthy City Board of Ed.* v.

*Doyle*, 429 U. S. 274 (1977), a public school teacher was not rehired because, allegedly, he had relayed to a radio station the substance of a memorandum relating to teacher dress and appearance that the school principal had circulated to various teachers. The memorandum was apparently prompted by the view of some in the administration that there was a relationship between teacher appearance and public support for bond issues, and indeed, the radio station promptly announced the adoption of the dress code as a news item. Most recently, in *Givhan* v. *Western Line Consolidated School District*, 439 U. S. 410 (1979), we held that First Amendment protection applies when a public employee arranges to communicate privately with his employer rather than to express his views publicly. Although the subject matter of Mrs. Givhan's statements were not the issue before the Court, it is clear that her statements concerning the School District's allegedly racially discriminatory policies involved a matter of public concern.

*Pickering*, its antecedents, and its progeny lead us to conclude that if Myers' questionnaire cannot be fairly characterized as constituting speech on a matter of public concern, it is unnecessary for us to scrutinize the reasons for her discharge.[6] When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment. Perhaps the government employer's dismissal of the worker may not be fair, but ordinary dismissals from government service which violate no fixed tenure or applicable statute or regulation are not subject to judicial review even if the reasons for the dismissal are alleged to be mistaken or unrea-

---

[6] See, *Clark* v. *Holmes*, 474 F. 2d 928 (CA7 1972), cert. denied, 411 U. S. 972 (1973); *Schmidt* v. *Fremont County School Dist.*, 558 F. 2d 982, 984 (CA10 1977).

sonable. *Board of Regents* v. *Roth,* 408 U. S. 564 (1972); *Perry* v. *Sindermann, supra; Bishop* v. *Wood,* 426 U. S. 341, 349–350 (1976).

We do not suggest, however, that Myers' speech, even if not touching upon a matter of public concern, is totally beyond the protection of the First Amendment. "[T]he First Amendment does not protect speech and assembly only to the extent it can be characterized as political. 'Great secular causes, with smaller ones, are guarded.'" *Mine Workers* v. *Illinois Bar Assn.,* 389 U. S. 217, 223 (1967), quoting *Thomas* v. *Collins,* 323 U. S. 516, 531 (1945). We in no sense suggest that speech on private matters falls into one of the narrow and well-defined classes of expression which carries so little social value, such as obscenity, that the State can prohibit and punish such expression by all persons in its jurisdiction. See *Chaplinsky* v. *New Hampshire,* 315 U. S. 568 (1942); *Roth* v. *United States, supra; New York* v. *Ferber,* 458 U. S. 747 (1982). For example, an employee's false criticism of his employer on grounds not of public concern may be cause for his discharge but would be entitled to the same protection in a libel action accorded an identical statement made by a man on the street. We hold only that when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior. Cf. *Bishop* v. *Wood, supra,* at 349–350. Our responsibility is to ensure that citizens are not deprived of fundamental rights by virtue of working for the government; this does not require a grant of immunity for employee grievances not afforded by the First Amendment to those who do not work for the State.

Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and con-

text of a given statement, as revealed by the whole record.[7] In this case, with but one exception, the questions posed by Myers to her co-workers do not fall under the rubric of matters of "public concern." We view the questions pertaining to the confidence and trust that Myers' co-workers possess in various supervisors, the level of office morale, and the need for a grievance committee as mere extensions of Myers' dispute over her transfer to another section of the criminal court. Unlike the dissent, *post*, at 163, we do not believe these questions are of public import in evaluating the performance of the District Attorney as an elected official. Myers did not seek to inform the public that the District Attorney's Office was not discharging its governmental responsibilities in the investigation and prosecution of criminal cases. Nor did Myers seek to bring to light actual or potential wrongdoing or breach of public trust on the part of Connick and others. Indeed, the questionnaire, if released to the public, would convey no information at all other than the fact that a single employee is upset with the status quo. While discipline and morale in the workplace are related to an agency's efficient performance of its duties, the focus of Myers' questions is not to evaluate the performance of the office but rather to gather ammunition for another round of controversy with her superiors. These questions reflect one employee's dissatisfaction with a transfer and an attempt to turn that displeasure into a cause célèbre.[8]

---

[7] The inquiry into the protected status of speech is one of law, not fact. See n. 10, *infra*.

[8] This is not a case like *Givhan*, where an employee speaks out as a citizen on a matter of general concern, not tied to a personal employment dispute, but arranges to do so privately. Mrs. Givhan's right to protest racial discrimination—a matter inherently of public concern—is not forfeited by her choice of a private forum. 439 U. S., at 415–416. Here, however, a questionnaire not otherwise of public concern does not attain that status because its subject matter could, in different circumstances, have been the topic of a communication to the public that might be of general interest. The dissent's analysis of whether discussions of office morale and discipline

To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark—and certainly every criticism directed at a public official—would plant the seed of a constitutional case. While as a matter of good judgment, public officials should be receptive to constructive criticism offered by their employees, the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs.

One question in Myers' questionnaire, however, does touch upon a matter of public concern. Question 11 inquires if assistant district attorneys "ever feel pressured to work in political campaigns on behalf of office supported candidates." We have recently noted that official pressure upon employees to work for political candidates not of the worker's own choice constitutes a coercion of belief in violation of fundamental constitutional rights. *Branti* v. *Finkel*, 445 U. S., at 515–516; *Elrod* v. *Burns*, 427 U. S. 347 (1976). In addition, there is a demonstrated interest in this country that government service should depend upon meritorious performance rather than political service. *CSC* v. *Letter Carriers*, 413 U. S. 548 (1973); *Public Workers* v. *Mitchell*, 330 U. S. 75 (1947). Given this history, we believe it apparent that the issue of whether assistant district attorneys are pressured to work in political campaigns is a matter of interest to the community upon which it is essential that public employees be able to speak out freely without fear of retaliatory dismissal.

### B

Because one of the questions in Myers' survey touched upon a matter of public concern and contributed to her discharge, we must determine whether Connick was justified in discharging Myers. Here the District Court again erred in imposing an unduly onerous burden on the State to justify

---

could be matters of public concern is beside the point—it does not answer whether *this* questionnaire is such speech.

⌒

Myers' discharge. The District Court viewed the issue of whether Myers' speech was upon a matter of "public concern" as a threshold inquiry, after which it became the government's burden to "clearly demonstrate" that the speech involved "substantially interfered" with official responsibilities. Yet *Pickering* unmistakably states, and respondent agrees,[9] that the State's burden in justifying a particular discharge varies depending upon the nature of the employee's expression. Although such particularized balancing is difficult, the courts must reach the most appropriate possible balance of the competing interests.[10]

## C

The *Pickering* balance requires full consideration of the government's interest in the effective and efficient fulfillment of its responsibilities to the public. One hundred years ago, the Court noted the government's legitimate purpose in "pro-

---

[9] See Brief for Respondent 9 ("These factors, including the degree of the 'importance' of plaintiff's speech, were proper considerations to be weighed in the *Pickering* balance"); Tr. of Oral Arg. 30 (counsel for respondent) ("I certainly would not disagree that the content of the questionnaire, whether it affects a matter of great public concern or only a very narrow internal matter, is a relevant circumstance to be weighed in the Pickering analysis").

[10] "The Constitution has imposed upon this Court final authority to determine the meaning and application of those words of that instrument which require interpretation to resolve judicial issues. With that responsibility, we are compelled to examine for ourselves the statements in issue and the circumstances under which they [are] made to see whether or not they . . . are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment, protect." *Pennekamp* v. *Florida*, 328 U. S. 331, 335 (1946) (footnote omitted).

Because of this obligation, we cannot "avoid making an independent constitutional judgment on the facts of the case." *Jacobellis* v. *Ohio*, 378 U. S. 184, 190 (1964) (opinion of BRENNAN, J.). See *Edwards* v. *South Carolina*, 372 U. S. 229, 235 (1963); *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 285 (1964); *NAACP* v. *Claiborne Hardware Co.*, 458 U. S. 886, 915–916, n. 50 (1982).

mot[ing] efficiency and integrity in the discharge of official duties, and [in] maintain[ing] proper discipline in the public service." *Ex parte Curtis*, 106 U. S., at 373. As JUSTICE POWELL explained in his separate opinion in *Arnett* v. *Kennedy*, 416 U. S. 134, 168 (1974):

> "To this end, the Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs. This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch. Prolonged retention of a disruptive or otherwise unsatisfactory employee can adversely affect discipline and morale in the work place, foster disharmony, and ultimately impair the efficiency of an office or agency."

We agree with the District Court that there is no demonstration here that the questionnaire impeded Myers' ability to perform her responsibilities. The District Court was also correct to recognize that "it is important to the efficient and successful operation of the District Attorney's office for Assistants to maintain close working relationships with their superiors." 507 F. Supp., at 759. Connick's judgment, and apparently also that of his first assistant Dennis Waldron, who characterized Myers' actions as causing a "mini-insurrection," was that Myers' questionnaire was an act of insubordination which interfered with working relationships.[11] When close working relationships are essential to fulfilling public

---

[11] Waldron testified that from what he had learned of the events on October 7, Myers "was trying to stir up other people not to accept the changes [transfers] that had been made on the memorandum and that were to be implemented." App. 167. In his view, the questionnaire was a "final act of defiance" and that, as a result of Myers' action, "there were going to be some severe problems about the changes." *Ibid.* Connick testified that he reached a similar conclusion after conducting his own investigation. "After I satisfied myself that not only wasn't she accepting the transfer, but that she was affirmatively opposing it and disrupting the routine of the office by this questionnaire. I called her in . . . [and dismissed her]." *Id.,* at 130.

responsibilities, a wide degree of deference to the employer's judgment is appropriate. Furthermore, we do not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action.[12] We caution that a stronger showing may be necessary if the employee's speech more substantially involved matters of public concern.

The District Court rejected Connick's position because "[u]nlike a statement of fact which might be deemed critical of one's superiors, [Myers'] questionnaire was not a statement of fact but the presentation and solicitation of ideas and opinions," which are entitled to greater constitutional protection because "'under the First Amendment there is no such thing as a false idea.'" *Ibid.* This approach, while perhaps relevant in weighing the value of Myers' speech, bears no logical relationship to the issue of whether the questionnaire undermined office relationships. Questions, no less than forcefully stated opinions and facts, carry messages and it requires no unusual insight to conclude that the purpose, if not the likely result, of the questionnaire is to seek to precipitate a vote of no confidence in Connick and his supervisors. Thus, Question 10, which asked whether or not the Assistants had confidence in and relied on the word of five named supervisors, is a statement that carries the clear potential for undermining office relations.

Also relevant is the manner, time, and place in which the questionnaire was distributed. As noted in *Givhan* v. *Western Line Consolidated School District*, 439 U. S., at 415, n. 4: "Private expression . . . may in some situations bring addi-

---

[12] Cf. *Perry Education Assn.* v. *Perry Local Educators' Assn.*, 460 U. S. 37, 52, n. 12 (1983) (proof of future disruption not necessary to justify denial of access to nonpublic forum on grounds that the proposed use may disrupt the property's intended function); *Greer* v. *Spock*, 424 U. S. 828 (1976) (same).

tional factors to the *Pickering* calculus. When a government employee personally confronts his immediate superior, the employing agency's institutional efficiency may be threatened not only by the content of the employee's message but also by the manner, time, and place in which it is delivered." Here the questionnaire was prepared and distributed at the office; the manner of distribution required not only Myers to leave her work but others to do the same in order that the questionnaire be completed.[13] Although some latitude in when official work is performed is to be allowed when professional employees are involved, and Myers did not violate announced office policy,[14] the fact that Myers, unlike Pickering, exercised her rights to speech at the office supports Connick's fears that the functioning of his office was endangered.

Finally, the context in which the dispute arose is also significant. This is not a case where an employee, out of purely academic interest, circulated a questionnaire so as to obtain useful research. Myers acknowledges that it is no coincidence that the questionnaire followed upon the heels of the transfer notice. When employee speech concerning office policy arises from an employment dispute concerning the very application of that policy to the speaker, additional weight must be given to the supervisor's view that the employee has threatened the authority of the employer to run the office. Although we accept the District Court's factual finding that Myers' reluctance to accede to the transfer order was not a sufficient cause in itself for her dismissal, and thus does not constitute a sufficient defense under *Mt. Healthy*

---

[13] The record indicates that some, though not all, of the copies of the questionnaire were distributed during lunch. Employee speech which transpires entirely on the employee's own time, and in nonwork areas of the office, bring different factors into the *Pickering* calculus, and might lead to a different conclusion. Cf. *NLRB* v. *Magnavox Co.*, 415 U. S. 322 (1974).

[14] The violation of such a rule would strengthen Connick's position. See *Mt. Healthy City Board of Ed.* v. *Doyle*, 429 U. S., at 284.

*City Board of Ed.* v. *Doyle,* 429 U. S. 274 (1977), this does not render irrelevant the fact that the questionnaire emerged after a persistent dispute between Myers and Connick and his deputies over office transfer policy.

## III

Myers' questionnaire touched upon matters of public concern in only a most limited sense; her survey, in our view, is most accurately characterized as an employee grievance concerning internal office policy. The limited First Amendment interest involved here does not require that Connick tolerate action which he reasonably believed would disrupt the office, undermine his authority, and destroy close working relationships. Myers' discharge therefore did not offend the First Amendment. We reiterate, however, the caveat we expressed in *Pickering,* 391 U. S., at 569: "Because of the enormous variety of fact situations in which critical statements by . . . public employees may be thought by their superiors . . . to furnish grounds for dismissal, we do not deem it either appropriate or feasible to attempt to lay down a general standard against which all such statements may be judged."

Our holding today is grounded in our longstanding recognition that the First Amendment's primary aim is the full protection of speech upon issues of public concern, as well as the practical realities involved in the administration of a government office. Although today the balance is struck for the government, this is no defeat for the First Amendment. For it would indeed be a Pyrrhic victory for the great principles of free expression if the Amendment's safeguarding of a public employee's right, as a citizen, to participate in discussions concerning public affairs were confused with the attempt to constitutionalize the employee grievance that we see presented here. The judgment of the Court of Appeals is

*Reversed.*

## APPENDIX TO OPINION OF THE COURT

Questionnaire distributed by respondent on October 7, 1980.

### PLAINTIFF'S EXHIBIT 2, App. 191

"PLEASE TAKE THE FEW MINUTES IT WILL REQUIRE TO FILL THIS OUT. YOU CAN FREELY EXPRESS YOUR OPINION WITH ANONYMITY GUARANTEED.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

1. How long have you been in the Office? _____
2. Were you moved as a result of the recent transfers? ___
3. Were the transfers as they effected *[sic]* you discussed with you by any superior prior to the notice of them being posted? _____
4. Do you think as a matter of policy, they should have been? _____
5. From your experience, do you feel office procedure regarding transfers has been fair? _____
6. Do you believe there is a rumor mill active in the office?
7. If so, how do you think it effects *[sic]* overall working performance of A.D.A. personnel? _____
8. If so, how do you think it effects *[sic]* office morale? ___
9. Do you generally first learn of office changes and developments through rumor? _____
10. Do you have confidence in and would you rely on the word of:
    Bridget Bane _____
    Fred Harper _____
    Lindsay Larson _____
    Joe Meyer _____
    Dennis Waldron _____
11. Do you ever feel pressured to work in political campaigns on behalf of office supported candidates? _____
12. Do you feel a grievance committee would be a worthwhile addition to the office structure? _____

13. How would you rate office morale? _____
14. Please feel free to express any comments or feelings you
have. _____

THANK YOU FOR YOUR COOPERATION IN THIS SURVEY."

JUSTICE BRENNAN, with whom JUSTICE MARSHALL, JUSTICE BLACKMUN, and JUSTICE STEVENS join, dissenting.

Sheila Myers was discharged for circulating a questionnaire to her fellow Assistant District Attorneys seeking information about the effect of petitioner's personnel policies on employee morale and the overall work performance of the District Attorney's Office. The Court concludes that her dismissal does not violate the First Amendment, primarily because the questionnaire addresses matters that, in the Court's view, are not of public concern. It is hornbook law, however, that speech about "the manner in which government is operated or should be operated" is an essential part of the communications necessary for self-governance the protection of which was a central purpose of the First Amendment. *Mills* v. *Alabama*, 384 U. S. 214, 218 (1966). Because the questionnaire addressed such matters and its distribution did not adversely affect the operations of the District Attorney's Office or interfere with Myers' working relationship with her fellow employees, I dissent.

## I

The Court correctly reaffirms the long-established principle that the government may not constitutionally compel persons to relinquish their First Amendment rights as a condition of public employment. *E. g.*, *Keyishian* v. *Board of Regents*, 385 U. S. 589, 605–606 (1967); *Pickering* v. *Board of Education*, 391 U. S. 563, 568 (1968); *Perry* v. *Sindermann*, 408 U. S. 593, 597 (1972). *Pickering* held that the First Amendment protects the rights of public employees "as citizens to comment on matters of public interest" in connection with the operation of the government agencies for which they work. 391 U. S., at 568. We recognized, however, that the

government has legitimate interests in regulating the speech of its employees that differ significantly from its interests in regulating the speech of people generally. *Ibid.* We therefore held that the scope of public employees' First Amendment rights must be determined by balancing "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Ibid.*

The balancing test articulated in *Pickering* comes into play only when a public employee's speech implicates the government's interests as an employer. When public employees engage in expression unrelated to their employment while away from the workplace, their First Amendment rights are, of course, no different from those of the general public. See *id.,* at 574. Thus, whether a public employee's speech addresses a matter of public concern is relevant to the constitutional inquiry only when the statements at issue—by virtue of their content or the context in which they were made—may have an adverse impact on the government's ability to perform its duties efficiently.[1]

The Court's decision today is flawed in three respects. First, the Court distorts the balancing analysis required under *Pickering* by suggesting that one factor, the context in which a statement is made, is to be weighed *twice*—first in

---

[1] Although the Court's opinion states that "if Myers' questionnaire cannot be fairly characterized as constituting speech on a matter of public concern, it is unnecessary for us to scrutinize the reasons for her discharge," *ante,* at 146 (footnote omitted), I do not understand it to imply that a governmental employee's First Amendment rights outside the employment context are limited to speech on matters of public concern. To the extent that the Court's opinion may be read to suggest that the dismissal of a public employee for speech unrelated to a subject of public interest does not implicate First Amendment interests, I disagree, because our cases establish that public employees enjoy the full range of First Amendment rights guaranteed to members of the general public. Under the balancing test articulated in *Pickering,* however, the government's burden to justify such a dismissal may be lighter. See n. 4, *infra.*

determining whether an employee's speech addresses a mat-
ter of public concern and then in deciding whether the state-
ment adversely affected the government's interest as an
employer.  See *ante*, at 147–148, 152–153.  Second, in con-
cluding that the effect of respondent's personnel policies on
employee morale and the work performance of the District
Attorney's Office is not a matter of public concern, the Court
impermissibly narrows the class of subjects on which public
employees may speak out without fear of retaliatory dis-
missal.  See *ante*, at 148–149.  Third, the Court misapplies
the *Pickering* balancing test in holding that Myers could con-
stitutionally be dismissed for circulating a questionnaire ad-
dressed to at least one subject that *was* "a matter of interest
to the community," *ante*, at 149, in the absence of evidence
that her conduct disrupted the efficient functioning of the
District Attorney's Office.

## II

The District Court summarized the contents of respond-
ent's questionnaire as follows:

> "Plaintiff solicited the views of her fellow Assistant Dis-
> trict Attorneys on a number of issues, including office
> transfer policies and the manner in which information of
> that nature was communicated within the office.  The
> questionnaire also sought to determine the views of As-
> sistants regarding office morale, the need for a griev-
> ance committee, and the level of confidence felt by the
> Assistants for their supervisors.  Finally, the question-
> naire inquired as to whether the Assistants felt pres-
> sured to work in political campaigns on behalf of office-
> supported candidates."  507 F. Supp. 752, 758 (ED La.
> 1981).

After reviewing the evidence, the District Court found
that "[t]aken as a whole, the issues presented in the question-
naire relate to the effective functioning of the District Attor-
ney's Office and are matters of public importance and con-
cern."  *Ibid.*  The Court of Appeals affirmed on the basis of

the District Court's findings and conclusions. 654 F. 2d 719 (CA5 1981). The Court nonetheless concludes that Myers' questions about the effect of petitioner's personnel policies on employee morale and overall work performance are not "of public import in evaluating the performance of the District Attorney as an elected official." *Ante*, at 148. In so doing, it announces the following standard: "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement . . . ." *Ante*, at 147–148.

The standard announced by the Court suggests that the manner and context in which a statement is made must be weighed on *both* sides of the *Pickering* balance. It is beyond dispute that how and where a public employee expresses his views are relevant in the second half of the *Pickering* inquiry—determining whether the employee's speech adversely affects the government's interests as an employer. The Court explicitly acknowledged this in *Givhan* v. *Western Line Consolidated School District*, 439 U. S. 410 (1979), where we stated that when a public employee speaks privately to a supervisor, "the employing agency's institutional efficiency may be threatened not only by the content of the . . . message but also by the manner, time, and place in which it is delivered." *Id.*, at 415, n. 4. But the fact that a public employee has chosen to express his views in private has nothing whatsoever to do with the first half of the *Pickering* calculus—whether those views relate to a matter of public concern. This conclusion is implicit in *Givhan*'s holding that the freedom of speech guaranteed by the First Amendment is not "lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public." 439 U. S., at 415–416.

The Court seeks to distinguish *Givhan* on the ground that speech protesting racial discrimination is "inherently of public concern." *Ante*, at 148, n. 8. In so doing, it suggests that there are two classes of speech of public concern: statements "of public import" because of their content, form, and con-

text, and statements that, by virtue of their subject matter, are "inherently of public concern." In my view, however, whether a particular statement by a public employee is addressed to a subject of public concern does not depend on where it was said or why. The First Amendment affords special protection to speech that may inform public debate about how our society is to be governed—regardless of whether it actually becomes the subject of a public controversy.[2]

"[S]peech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison* v.

---

[2] Although the parties offered no evidence on whether the subjects addressed by the questionnaire were, in fact, matters of public concern, extensive local press coverage shows that the issues involved are of interest to the people of Orleans Parish. Shortly after the District Court took the case under advisement, a major daily newspaper in New Orleans carried a 7-paragraph story describing the questionnaire, the events leading to Myers' dismissal, and the filing of this action. The Times-Picayune/The States-Item, Dec. 6, 1980, section 1, p. 21, col. 1. The same newspaper also carried a 16-paragraph story when the District Court ruled in Myers' favor, Feb. 11, 1981, section 1, p. 15, col. 2; a 14-paragraph story when the Court of Appeals affirmed the District Court's decision, July 28, 1981, section 1, p. 11, col. 1; a 12-paragraph story when this Court granted Connick's petition for certiorari, Mar. 9, 1982, section 1, p. 15, col. 5.; and a 17-paragraph story when we heard oral argument, Nov. 9, 1982, section 1, p. 13, col. 5.

In addition, matters affecting the internal operations of the Orleans Parish District Attorney's Office often receive extensive coverage in the same newspaper. For example, The Times-Picayune/The States-Item carried a lengthy story reporting that the agency moved to "plush new offices," and describing in detail the "privacy problem" faced by Assistant District Attorneys because the office was unable to obtain modular furniture with which to partition its new space. Jan. 25, 1981, section 8, p. 13, col. 1. It also carried a 16-paragraph story when a committee of the Louisiana State Senate voted to prohibit petitioner from retaining a public relations specialist. July 9, 1982, section 1, p. 14, col. 1.

In light of the public's interest in the operations of the District Attorney's Office in general, and in the dispute between the parties in particular, it is quite possible that, contrary to the Court's view, *ante*, at 148–149, Myers' comments concerning morale and working conditions in the office would actually have engaged the public's attention had she stated them publicly.

*Louisiana,* 379 U. S. 64, 74–75 (1964). "The maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means, an opportunity essential to the security of the Republic, is a fundamental principle of our constitutional system." *Stromberg* v. *California,* 283 U. S. 359, 369 (1931).

We have long recognized that one of the central purposes of the First Amendment's guarantee of freedom of expression is to protect the dissemination of information on the basis of which members of our society may make reasoned decisions about the government. *Mills* v. *Alabama,* 384 U. S., at 218–219; *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 269–270 (1964). See A. Meiklejohn, Free Speech and Its Relation to Self-Government 22–27 (1948). "No aspect of that constitutional guarantee is more rightly treasured than its protection of the ability of our people through free and open debate to consider and resolve their own destiny." *Saxbe* v. *Washington Post Co.,* 417 U. S. 843, 862 (1974) (POWELL, J., dissenting).

Unconstrained discussion concerning the manner in which the government performs its duties is an essential element of the public discourse necessary to informed self-government.

> "Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs. This of course includes discussions of candidates, structures and forms of government, *the manner in which government is operated or should be operated,* and all such matters relating to political processes." *Mills* v. *Alabama, supra,* at 218–219 (emphasis added).

---

Moreover, as a general matter, the media frequently carry news stories reporting that personnel policies in effect at a government agency have resulted in declining employee morale and deteriorating agency performance.

The constitutionally protected right to speak out on governmental affairs would be meaningless if it did not extend to statements expressing criticism of governmental officials. In *New York Times Co.* v. *Sullivan, supra,* we held that the Constitution prohibits an award of damages in a libel action brought by a public official for criticism of his official conduct absent a showing that the false statements at issue were made with "'actual malice.'" 376 U. S., at 279–280. We stated there that the First Amendment expresses "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Id.,* at 270. See *Garrison* v. *Louisiana, supra,* at 76.

In *Pickering* we held that the First Amendment affords similar protection to critical statements by a public school teacher directed at the Board of Education for whom he worked. 391 U. S., at 574. In so doing, we recognized that "free and open debate" about the operation of public schools "is vital to informed decision-making by the electorate." *Id.,* at 571–572. We also acknowledged the importance of allowing teachers to speak out on school matters.

> "Teachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allotted to the operation of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal." *Id.,* at 572.

See also *Arnett* v. *Kennedy,* 416 U. S. 134, 228 (1974) (MARSHALL, J., dissenting) (describing "[t]he importance of Government employees' being assured of their right to freely comment on the conduct of Government, to inform the public of abuses of power and of the misconduct of their superiors . . .").

Applying these principles, I would hold that Myers' questionnaire addressed matters of public concern because it discussed subjects that could reasonably be expected to be of interest to persons seeking to develop informed opinions about the manner in which the Orleans Parish District Attorney, an elected official charged with managing a vital governmental agency, discharges his responsibilities. The questionnaire sought primarily to obtain information about the impact of the recent transfers on morale in the District Attorney's Office. It is beyond doubt that personnel decisions that adversely affect discipline and morale may ultimately impair an agency's efficient performance of its duties. See *Arnett* v. *Kennedy, supra,* at 168 (opinion of POWELL, J.). Because I believe the First Amendment protects the right of public employees to discuss such matters so that the public may be better informed about how their elected officials fulfill their responsibilities, I would affirm the District Court's conclusion that the questionnaire related to matters of public importance and concern.

The Court's adoption of a far narrower conception of what subjects are of public concern seems prompted by its fears that a broader view "would mean that virtually every remark—and certainly every criticism directed at a public official—would plant the seed of a constitutional case." *Ante,* at 149. Obviously, not every remark directed at a public official by a public employee is protected by the First Amendment.[3] But deciding whether a particular matter is of public concern is an inquiry that, by its very nature, is a sensitive one for judges charged with interpreting a constitutional provision intended to put "the decision as to what views shall be

---

[3] Perhaps the simplest example of a statement by a public employee that would not be protected by the First Amendment would be answering "No" to a request that the employee perform a lawful task within the scope of his duties. Although such a refusal is "speech," which implicates First Amendment interests, it is also insubordination, and as such it may serve as the basis for a lawful dismissal.

voiced largely into the hands of each of us . . . ." *Cohen* v. *California*, 403 U. S. 15, 24 (1971).[4] The Court recognized the sensitive nature of this determination in *Gertz* v. *Robert Welch, Inc.*, 418 U. S. 323 (1974), which held that the scope of the constitutional privilege in defamation cases turns on whether or not the plaintiff is a public figure, not on whether the statements at issue address a subject of public concern. In so doing, the Court referred to the "difficulty of forcing state and federal judges to decide on an *ad hoc* basis which publications address issues of 'general or public interest' and which do not," and expressed "doubt [about] the wisdom of committing this task to the conscience of judges." *Id.*, at 346. See also *Rosenbloom* v. *Metromedia, Inc.*, 403 U. S. 29, 79 (1971) (MARSHALL, J., dissenting). In making such a delicate inquiry, we must bear in mind that "the citizenry is the final judge of the proper conduct of public business." *Cox Broadcasting Corp.* v. *Cohn*, 420 U. S. 469, 495 (1975).

The Court's decision ignores these precepts. Based on its own narrow conception of which matters are of public concern, the Court implicitly determines that information con-

---

[4] Indeed, it has been suggested that "a classification that bases the right to First Amendment protection on some estimate of how much general interest there is in the communication is surely in conflict with the whole idea of the First Amendment." T. Emerson, The System of Freedom of Expression 554 (1970). The degree to which speech is of interest to the public may be relevant in determining whether a public employer may constitutionally be required to tolerate some degree of disruption resulting from its utterance. See *ante*, at 152. In general, however, whether a government employee's speech is of "public concern" must be determined by reference to the broad conception of the First Amendment's guarantee of freedom of speech found necessary by the Framers

"to supply the public need for information and education with respect to the significant issues of the times. . . . Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period." *Thornhill* v. *Alabama*, 310 U. S. 88, 102 (1940) (footnote omitted).

See *Wood* v. *Georgia*, 370 U. S. 375, 388 (1962).

cerning employee morale at an important government office will not inform public debate. To the contrary, the First Amendment protects the dissemination of such information so that the people, not the courts, may evaluate its usefulness. The proper means to ensure that the courts are not swamped with routine employee grievances mischaracterized as First Amendment cases is not to restrict artificially the concept of "public concern," but to require that adequate weight be given to the public's important interests in the efficient performance of governmental functions and in preserving employee discipline and harmony sufficient to achieve that end. See Part III, *infra*.[5]

---

[5] The Court's narrow conception of which matters are of public interest is also inconsistent with the broad view of that concept articulated in our cases dealing with the constitutional limits on liability for invasion of privacy. In *Time, Inc.* v. *Hill*, 385 U. S. 374 (1967), we held that a defendant may not constitutionally be held liable for an invasion of privacy resulting from the publication of a false or misleading report of "matters of public interest" in the absence of proof that the report was published with knowledge of its falsity or reckless disregard for its truth. *Id.*, at 389–391. In that action, Hill had sought damages resulting from the publication of an allegedly false report that a new play portrayed the experience of him and his family when they were held hostage in their home in a publicized incident years earlier. We entertained "no doubt that . . . the opening of a new play linked to an actual incident, is a matter of public interest." *Id.*, at 388. See also *Cox Broadcasting Corp.* v. *Cohn*, 420 U. S. 469 (1975) (holding that a radio station could not constitutionally be held liable for broadcasting the name of a rape victim, because the victim's name was contained in public records). Our discussion in *Time, Inc.* v. *Hill* of the breadth of the First Amendment's protections is directly relevant here:

"The guarantees for speech and press are not the preserve of political expression or comment upon public affairs, essential as those are to healthy government. One need only pick up any newspaper or magazine to comprehend the vast range of published matter which exposes persons to public view, both private citizens and public officials. . . . 'Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period.' *Thornhill* v. *Alabama*, 310 U. S. 88, 102. 'No suggestion can be found in the Constitution that the freedom there guaranteed for speech and the press bears

## III

Although the Court finds most of Myers' questionnaire unrelated to matters of public interest, it does hold that one question—asking whether Assistants felt pressured to work in political campaigns on behalf of office-supported candidates—addressed a matter of public importance and concern. The Court also recognizes that this determination of public interest must weigh heavily in the balancing of competing interests required by *Pickering*. Having gone that far, however, the Court misapplies the *Pickering* test and holds—against our previous authorities—that a public employer's mere apprehension that speech will be disruptive justifies suppression of that speech when all the objective evidence suggests that those fears are essentially unfounded.

*Pickering* recognized the difficulty of articulating "a general standard against which all . . . statements may be judged," 391 U. S., at 569; it did, however, identify a number of factors that may affect the balance in particular cases. Those relevant here are whether the statements are directed to persons with whom the speaker "would normally be in contact in the course of his daily work"; whether they had an adverse effect on "discipline by immediate superiors or harmony among coworkers"; whether the employment relationship in question is "the kind . . . for which it can per-

---

an inverse ratio to the timeliness and importance of the ideas seeking expression.' *Bridges* v. *California*, 314 U. S. 252, 269." 385 U. S., at 388.

The quoted passage makes clear that, contrary to the Court's view, *ante*, at 143, n. 5, the subjects touched upon in respondent's questionnaire fall within the broad conception of "matters of public interest" that defines the scope of the constitutional privilege in invasion of privacy cases. See Restatement (Second) of Torts § 652D, Comment *j* (1977):

"The scope of a matter of legitimate concern to the public is not limited to 'news,' in the sense of reports of current events or activities. It extends also to the use of names, likenesses or facts in giving information to the public for purposes of education, amusement or enlightenment, when the public may reasonably be expected to have a legitimate interest in what is published."

suasively be claimed that personal loyalty and confidence are necessary to their proper functioning"; and whether the statements "have in any way either impeded [the employee's] proper performance of his daily duties . . . or . . . interfered with the regular operation of the [office]." *Id.*, at 568–573. In addition, in *Givhan*, we recognized that when the statements in question are made in private to an employee's immediate supervisor, "the employing agency's institutional efficiency may be threatened not only by the content of the . . . message but also by the manner, time, and place in which it is delivered." 439 U. S., at 415, n. 4. See *supra*, at 159.

The District Court weighed all of the relevant factors identified by our cases. It found that petitioner failed to establish that Myers violated either a duty of confidentiality or an office policy. 507 F. Supp., at 758–759. Noting that most of the copies of the questionnaire were distributed during lunch, it rejected the contention that the distribution of the questionnaire impeded Myers' performance of her duties, and it concluded that "Connick has not shown *any* evidence to indicate that the plaintiff's work performance was adversely affected by her expression." *Id.*, at 754–755, 759 (emphasis supplied).

The Court accepts all of these findings. See *ante*, at 151. It concludes, however, that the District Court failed to give adequate weight to the context in which the questionnaire was distributed and to the need to maintain close working relationships in the District Attorney's Office. In particular, the Court suggests the District Court failed to give sufficient weight to the disruptive potential of Question 10, which asked whether the Assistants had confidence in the word of five named supervisors. *Ante*, at 152. The District Court, however, explicitly recognized that this was petitioner's "most forceful argument"; but after hearing the testimony of four of the five supervisors named in the question, it found that the question had no adverse effect on Myers' relationship with her superiors. 507 F. Supp., at 759.

To this the Court responds that an employer need not wait until the destruction of working relationships is manifest before taking action. In the face of the District Court's finding that the circulation of the questionnaire had no disruptive effect, the Court holds that respondent may be dismissed because petitioner "reasonably believed [the action] would disrupt the office, undermine his authority, and destroy close working relationships." *Ante*, at 154. Even though the District Court found that the distribution of the questionnaire did not impair Myers' working relationship with her supervisors, the Court bows to petitioner's judgment because "[w]hen close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate." *Ante*, at 151–152.

Such extreme deference to the employer's judgment is not appropriate when public employees voice critical views concerning the operations of the agency for which they work. Although an employer's determination that an employee's statements have undermined essential working relationships must be carefully weighed in the *Pickering* balance, we must bear in mind that "the threat of dismissal from public employment is . . . a potent means of inhibiting speech." *Pickering*, 391 U. S., at 574. See *Keyishian* v. *Board of Regents*, 385 U. S., at 604. If the employer's judgment is to be controlling, public employees will not speak out when what they have to say is critical of their supervisors. In order to protect public employees' First Amendment right to voice critical views on issues of public importance, the courts must make their own appraisal of the effects of the speech in question.

In this regard, our decision in *Tinker* v. *Des Moines Independent Community School District*, 393 U. S. 503 (1969), is controlling. *Tinker* arose in a public school, a context similar to the one in which the present case arose in that the determination of the scope of the Constitution's guarantee of freedom of speech required consideration of the "special

characteristics of the . . . environment" in which the expression took place. See *id.*, at 506. At issue was whether public high school students could constitutionally be prohibited from wearing black armbands in school to express their opposition to the Vietnam conflict. The District Court had ruled that such a ban "was reasonable because it was based upon [school officials'] fear of a disturbance from the wearing of armbands." *Id.*, at 508. We found that justification inadequate, because "in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Ibid.* We concluded:

> "In order for the State . . . to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint. *Certainly where there is no finding and no showing that engaging in the forbidden conduct would 'materially and substantially interfere with the requirements of appropriate discipline in the operation of the school,' the prohibition cannot be sustained."* *Id.*, at 509 (emphasis supplied) (quoting *Burnside* v. *Byars*, 363 F. 2d 744, 749 (CA5 1966)).

Because the speech at issue addressed matters of public importance, a similar standard should be applied here. After reviewing the evidence, the District Court found that "it cannot be said that the defendant's interest in promoting the efficiency of the public services performed through his employees was either adversely affected or substantially impeded by plaintiff's distribution of the questionnaire." 507 F. Supp., at 759. Based on these findings the District Court concluded that the circulation of the questionnaire was protected by the First Amendment. The District Court applied the proper legal standard and reached an acceptable accommodation between the competing interests. I would affirm its decision and the judgment of the Court of Appeals.

## IV

The Court's decision today inevitably will deter public employees from making critical statements about the manner in which government agencies are operated for fear that doing so will provoke their dismissal. As a result, the public will be deprived of valuable information with which to evaluate the performance of elected officials. Because protecting the dissemination of such information is an essential function of the First Amendment, I dissent.