**Arthur T. HILL, III, Plaintiff,**

v.

**Rodney E. SLATER, Secretary, Department of Transportation, et al., Defendants.**

**No. Civ.A. 97–0662 (JR).**

United States District Court, District of Columbia.

Jan. 23, 1998.

William L. Bransford, Shaw, Bransford & O'Rourke, Washington, DC, for Plaintiff.

Rudolph Contreras, Assistant U.S. Attorney, Washington, DC, for Defendants.

## MEMORANDUM

ROBERTSON, District Judge.

Until the transfer that gave rise to this lawsuit, plaintiff, a white male, was an Area Supervisor of the North Area, Chicago Center, for the Federal Aviation Administration ("FAA"). Plaintiff's claim is that his transfer—from a supervisory position to a non-supervisory one—violated his First and Fifth Amendment rights. Both sides have moved for summary judgment.

### Facts

Plaintiff became a supervisor on October 1, 1996. Def. Statement ¶ 2; Pltf. Statement ¶ 1. His responsibilities included direct management or oversight of about 72 employees, including a number of women and persons who are members of racial minority groups. Def. Ex. 1, Hill Dep. at 23.

In November 1996, an article entitled "No Way Out" appeared in *Government Executive* magazine. The first two paragraphs read as follows:

> Arthur Hill, a manager for the Federal Aviation Administration and member of the Federal Managers Association, isn't taking any more chances with equal employment opportunity complaints. He's been closely involved in several EEO complaints which, he contends, were unfounded.
>
> As a result, he's radically altered his management style, consciously distancing himself from some employees. "You meet a minority or a woman, you keep your conversations to a curt manner and that's it. You don't try to be friendly," says Hill. "Friendliness can be misconstrued, twisted out of context if you're just joking with somebody. You're better off as a manager isolating yourself from that section of the workforce."

Def. Ex. 4. On November 26, 1996, Dorothy Davis and Diana Mulka, two FAA employees who were concerned about plaintiff's statements, independently brought copies of the article to Ralph Davis, plaintiff's third-line supervisor.[1] Each meeting was brief, and each person expressed general concern about the way other FAA employees might construe plaintiff's alleged remarks. Neither individual was supervised by plaintiff, and, in fact, no one whom plaintiff supervised complained about the statements. Def. Ex. 5, Davis Dep. at 14–18. Dorothy Davis is plaintiff's peer in rank and serves a National President of the National Black Coalition of FAA employees. Def. Statement of Facts ¶ 9; Def. Ex. 5, Davis Dep. at 11–13. Diana Mulka, also plaintiff's peer, is on the Executive Board of the Professional Women Controllers Organization. Def. Statement of Facts ¶ 11; Def. Ex. 5, Davis Dep. at 13–14.

Ralph Davis read the article during his meeting with Dorothy Davis. Def. Statement of Facts ¶ 10; Def. Ex. 5, Davis Dep. at 15. In her brief meeting with Ralph Davis, Diana Mulka spoke of her "concerns" about people of color who worked with plaintiff at the Chicago Center,

Q: Did she say anything else?

Ralph Davis: Not that I can recall.

Q: Did she explain what she meant about the concerns she would have?

A: No.

Q: Did you ask her what concerns she would have?

A: No.

Def. Ex. 5, Davis Dep. at 18. Dorothy Davis and Diana Mulka told Ralph Davis that the statements in the article had eroded their trust and confidence in plaintiff. Def. Statement of Facts ¶¶ 31–34. Plaintiff's first-line supervisor, Lynette Yeary, also approached Ralph Davis, Def. Statement of Facts ¶ 14, saying that she was personally offended by the statements reported in the article. Def. Ex. 19, Yeary Affidavit.

After his meetings with Dorothy Davis and Diana Mulka, Ralph Davis faxed a copy of the article to Maureen Woods, who was Ralph Davis' second-line supervisor and manager of the Air Traffic Division, Great Lakes Region. Maureen Woods discussed the article in a meeting with five other FAA supervisors, including a representative from the legal division. She concluded that, "in my mind, what we had (the article) was not demonstrated behavior by Hill, but articulat-

---

1. A third-line supervisor, in government parlance, is three levels up the hierarchy.

ed behavior by Hill. Although there was no current evidence that Hill had acted in a disparate manner towards certain groups of people the statements attributed to him in the article articulated that he held such ideas about certain groups, and that was not something a management official should espouse." Def. Ex. 7, Woods Affidavit at 2.

Ralph Davis instructed two of his subordinates to investigate the article. They decided they would likely be unable to obtain a copy of the reporter's notes. Def. Statement of Facts ¶¶ 18–20. One of Davis' assistants faxed a copy of the article to Joe Gonzalez, Acting Manager of FAA's Civil Rights Office, Great Lakes Region. Gonzalez' conclusion was that "the statements attributed to Mr. Hill appear to cast a great deal of doubt on the usefulness and the fairness of the EEO complaint process." Pltf. Ex. F, Gonzalez Affidavit at 1.

Davis also had a conversation with Pete Salmon, a supervisor who had known plaintiff since 1973. Def. Statement of Facts ¶ 21. Salmon said, referring to the article, "That's vintage Art Hill." Def. Ex. 5, Davis Dep. at 58–59. Ralph Davis assumed that Salmon was referring to plaintiff's relationships with women and minorities, but he later admitted that it was not clear what Salmon meant, and that he might have been saying that plaintiff was blunt in his opinions. Id. at 60.

While all of these supervisors were discussing the article, plaintiff was away on vacation. He was not scheduled to return until the day after Thanksgiving, November 29, 1996. Ralph Davis was scheduled to be out of the office on November 29, so he asked the acting assistant traffic manager to meet with plaintiff, inform him of the investigation, schedule a meeting with him for the following Monday, and tell him that he would be transferred out of his supervisory position pending the completion of the investigation. Def. Statement of Facts ¶¶ 23, 24. The assistant manager met with plaintiff and relayed this information to him. Id. ¶ 23; Def. Ex. 11, Roger Becker, Record of Conference.

Ralph Davis met with plaintiff in December. Also present were one of Ralph Davis'

assistants and two individuals who attended at plaintiff's request. Def. Statement of Facts ¶ 27. Davis asked plaintiff whether the article was accurate. Plaintiff responded that he had been misquoted. It was agreed at this meeting that plaintiff would provide an explanation. The parties now dispute one another's statements about the nature of the explanation plaintiff agreed to provide, but there is no dispute that plaintiff asked Ralph Davis to provide a written summary of "what [Davis] was doing and what Mr. Davis wanted from plaintiff and [that] Mr. Davis refused." Pltf. Statement of Facts ¶ 7; Pltf. Ex. E, Hill Dep. at 63–64; Pltf. Mot. Ex. 3, Davis Dep. at 84–85.

Following his meeting with Ralph Davis, plaintiff sent a letter to the editor of *Government Executive* saying that his statements had been "misconstrued." He faxed a copy of that letter to Ralph Davis on December 4. Def. Ex. 14, Hill Letter. Plaintiff's letter also stated that he keeps all employees at arm's length, not just minority employees. *Id.*

Soon thereafter, Gonzalez, Mulka, and the plaintiff attended an ARTCC[2] roundtable meeting. Plaintiff brought up the subject of his statements and said that he thought his First Amendment rights had been violated. Def. Statement of Fact ¶ 37; Mulka Affidavit. Mulka responded that she thought plaintiff had been treated appropriately. *Id.* Defendant describes this event as a tense confrontation; plaintiff disputes this characterization and notes that Mulka testified that the exchange was brief and nonthreatening.

More than a month later, on January 17, 1997, Davis met again with plaintiff. At this meeting, Davis told plaintiff that his letter did not satisfy him because it did not refute any of the quoted material. Def. Statement of Fact ¶ 39. Davis informed plaintiff that, accordingly, plaintiff was being transferred to the nonsupervisory position of Special Projects Officer. That transfer was accomplished, and plaintiff then filed this lawsuit.

### Analysis

██ The First Amendment principles applicable to this case are clear—up to a

---

2. No explanation for this acronym is given in the record.

point. In order for speech by a government employee to be protected by the First Amendment, the "speech must be on a matter of public concern, and the employee's interest in expressing herself on this matter must not be outweighed by any injury the speech would cause to 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Waters v. Churchill,* 511 U.S. 661, 114 S.Ct. 1878, 1884, 128 L.Ed.2d 686 (1994), *quoting Connick v. Myers,* 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983).

Justice O'Connor, writing for the plurality in *Waters,* observed that the government has "extra power" in regulating the speech of employees, because of the nature of its mission as employer:

> Government agencies are charged by law with doing particular tasks. Agencies hire employees to help do those tasks as effectively and efficiently as possible. When someone who is paid a salary so that she will contribute to an agency's effective operation begins to do or say things that detract from the agency's effective operation, the government employer must have some power to restrain her. The reason the governor may ... fire the deputy is not that this dismissal would somehow be narrowly tailored to a compelling government interest. It is that the governor and the governor's staff have a job to do, and the governor justifiably feels that a quiet or subordinate would allow them to do this job more effectively.

*Waters,* 114 S.Ct. at 1887.

The dispute in the *Waters* case was over "how the factual basis for applying the test—what the speech was, in what tone it was delivered, what the listeners' reactions were ...—is to be determined." *Id.* at 1884. The plurality held that courts should defer to a government employers' reasonable determinations of what was actually said. *Id.* However, the Court in *Waters* "reconciled" itself to answering these procedural questions on a case-by-case basis and concluded that "the propriety of a proposed procedure must turn on the particular context in which the question arises—on the cost of the procedure and the relative magnitude and constitutional significance of the risks it would decrease and increase." *Id.* at 1886.

The issue in this case is not what plaintiff actually said to the newspaper.[3] Here, the question is whether plaintiff's employer reasonably predicted that plaintiff's speech would be disruptive. Although lower courts are advised, by Justice Souter's concurring opinion in *Waters,* 114 S.Ct. at 1893, that the reasonableness test set out by the plurality is "clearly the one that [we] should apply," and although the Supreme Court has "given substantial weight to government employers' reasonable predictions of disruption," *id.* (plurality opinion) 114 S.Ct. at 1887, *citing Connick, supra* at 151–52; *U.S. Civil Service Commission v. Letter Carriers,* 413 U.S. 548, 566–67, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973); *Sable Communications of Cal., Inc. v. FCC,* 492 U.S. 115, 129, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989); *Texas v. Johnson,* 491 U.S. 397, 409, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989), there is no clear rule about how the reasonableness test should be applied.

Justice O'Connor's opinion in *Waters* provides no guidance on this point, noting only that in *Rankin v. McPherson,* 483 U.S. 378, 388, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987); *Connick,* 461 U.S. at 152; and *Pickering v. Board Ed. of Township High School Dist. 205,* 391 U.S. 563, 569–71, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), the Court required the government to make "a substantial showing that the speech [was] in fact likely to be disruptive before it may be punished." *Waters,* 114 S.Ct. at 1887.

*Jeffries v. Harleston,* 52 F.3d 9 (2d Cir. 1995), interpreting *Waters,* holds that, in order to prevail against a First Amendment challenge, a government employer must have formed a reasonable belief regarding what the employee said and must show that it punished the employee because it believed

---

**3.** Plaintiff's argument that the FAA acted unreasonably in determining the contents of his actual statements to the magazine is unpersuasive. The record shows that he was given a chance to clarify his statements, and that instead he quibbled over the exact form his response was to take.

the speech was substantially likely to be disruptive. *Id.* at 10. In this case, defendant contends there is no genuine issue of fact as to the following, (presumably crafted in the light of the *Waters* and *Jeffries* decisions):

> Upon reading the article, Mr. Davis considered Mr. Hill's statements in the article to have a serious negative impact on the office's operation and held the potential to disrupt plaintiff's relationships with his subordinates and other employees at the Chicago center. Mr. Davis felt that females and minorities would likely feel that they could not be treated fairly and that any actions taken by plaintiff concerning them could be viewed as discriminatory. He also felt that statements in the article created an atmosphere in which FAA employees will believe that the plaintiff indeed acts as he is depicted in the article (i.e., practices disparate treatment).

Def. Statement of Fact ¶ 13 (citations omitted). Plaintiff does not controvert that statement of fact (except, again, to quibble with his employer's conclusion that he did in fact make the statements attributed to him). The record thus definitively establishes that the FAA did believe that plaintiff's statements were potentially disruptive. What the record does not answer, however, is the dispositive question of *whether that belief was reasonable.* Similarly, the record asks more questions than it answers about what our Court of Appeals has recognized as "pertinent considerations":

> "Whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise."

*Hall v. Ford,* 856 F.2d 255, 260 (D.C.Cir. 1988), *quoting Rankin v. McPherson,* 483 U.S. 378, 107 S.Ct. 2891, 2899, 97 L.Ed.2d 315 (1987).

In short, it is not possible on this record to grant either side's motion for summary judgment. A trial will be necessary. At the trial, the Court will consider it established that plaintiff's speech was on a matter of public concern. The burden of establishing the reasonableness of its belief that the speech would be sufficiently disruptive to satisfy the *Connick* test has shifted to defendant.

### *ORDER*

For reasons set forth in the accompanying memorandum, it is this 23d day of January 1998,

**ORDERED** that the motion of defendants' for summary judgment [# 15] is **denied.** It is

**FURTHER ORDERED** that the motion of plaintiff for summary judgment [# 17] is **denied.** It is

**FURTHER ORDERED** that plaintiff's motion for a continuance of trial date [# 25] is **granted.** And it is

**FURTHER ORDERED** that trial is set for 9:30 a.m., April 22, 1998.