**Dr. Clyde R. HAMER, Plaintiffs,**

**v.**

**George J. BROWN, Chancellor, SAU Technical Branch, in his Individual and Official Capacity; Dr. Harold T. Brinson, President, SAU, in his Individual and Official Capacity; Gary L. Oden, Vice Chancellor for Development and Extended Education, SAU, in his individual and Official capacity; and Members of the Board of Trustees, Mr. Perrin Jones, Chairperson, El Dorado; Mr. William Handy, Secretary, Magnolia; Mr. Bob Burns, Magnolia; Ms. Virginia Todd, Magnolia; Mr. Roy Ledbetter, East Camden, Defendants.**

No. ED 84–1164.

United States District Court,
W.D. Arkansas,
El Dorado Division.

Aug. 15, 1986.

Pat Tucker and Danny Thrailkill, Tucker & Thrailkill, Mena, Ark., John Wesley Hall, Jr., Little Rock, Ark., for plaintiffs.

Allen Roberts, Roberts, Harrell, Lindsey & Foster, Camden, Ark., for defendants.

## MEMORANDUM OPINION

OREN HARRIS, Senior District Judge.

In this action the plaintiff, Dr. Clyde D. Hamer, alleges that the defendants conduct deprived him of his rights to free speech and to petition the government for redress of grievances protected by the First and Fourteenth Amendments to the United States Constitution. Jurisdiction is based upon 28 U.S.C. § 1343 and 42 U.S.C. § 1983.

Pursuant to regular notice, the case was tried on its merits without benefit of a jury, commencing May 27, 1986. The action was tried to a completion in two days. Upon completion of the trial the case was taken under advisement pending receipt of post-trial briefs to be filed by the parties.

The Court incorporates into this Memorandum Opinion findings of fact and conclusions of law pursuant to Rule 52, F.R. C.P.

Dr. Hamer received a bachelor of science degree in sanitary science from the University of Oklahoma in 1966. In 1970 he received a master's degree in public health, and in 1977 he obtained his Doctor of Education degree in Vocational-Technical and Career Education. Dr. Hamer was hired by Southern Arkansas University-Technical Branch (SAU-Tech) in East Camden, Arkansas, in 1978 as Director of the Environmental Academy. Within a few months after his arrival on campus Dr. Hamer also assumed the duties of Director of the Public Administrative and Technical Services Division (PATSD), a division in the college unit of SAU-Tech.

On February 3, 1982, Dr. Hamer was notified by a memorandum from defendant, George J. Brown, Chancellor of SAU-Tech, that effective March 1, 1982, his assignment was being changed. On that date Dr. Hamer was removed as Director of the Environmental Academy. Dr. Hamer remained at SAU-Tech as Director of PATSD until that division was abolished and his position terminated at the end of the 1983–84 school year. The decision was made to terminate this division due to the low enrollment. Dr. Hamer accepted and signed a terminal contract for the school year 1983–84 on May 3, 1983. (Plaintiff's Exhibit 9) No reassignment was made after plaintiff's termination and the abolishment of the PATSD.

Plaintiff contends that his difficulties at SAU-Tech, which ultimately resulted in the

abolishment of the PATSD and his termination as its director, arose after he spoke to a committee of the Arkansas Fire Prevention Commission which came to the SAU-Tech campus in March of 1982.

On about March 15, 1982, an Arkansas Fire Prevention committee came to the SAU-Tech campus to investigate complaints concerning housing, and food and telephone service, made by firefighters around the state who had attended training sessions at the Arkansas Fire Training Academy located on the SAU-Tech campus. The committee, composed of Maria Conway, Ken Riley, Red Morris and Mark Johnson, met with Dr. Brown and arranged to look at the business records of the Fire Training Academy. Dr. Hamer was asked to speak to the committee that evening concerning his perceptions of problems on campus. Dr. Hamer had no connection with and no knowledge of the operation of the Fire Training Academy.

A day or two after the committee meeting defendant, Gary Oden, Vice Chancellor for Academic Affairs, hearing of Dr. Hamer's presence at the meeting, asked Dr. Hamer if he had talked to the committee and what he had said to them. Dr. Hamer refused to discuss it with Mr. Oden.

Subsequent to their visit to the SAU-Tech campus the Fire Prevention Commission held a meeting on March 31, 1982, attended by Dr. Brown. At the meeting a resolution proposed by the committee was passed out which recommended that the Fire Training Academy be removed from Southern Arkansas University and placed under the Director of Vocational and Technical Education. (Plaintiff's Exhibit 6) No further action was taken to implement the resolution. The committee's report and recommendation in April, 1982, stated that no wrong doing was found or "any areas out of compliance with the law or proper State accounting procedure." (Defendants' Exhibit 8)

Plaintiff asserts that he told the committee that there was a problem with campus money not being used in the ways intended, specifically, that the administration was moving money around to make the place look nice while the technical programs went underfunded. He also contends that he told the committee that the administration indiscriminately fires the people it does not like and then creates documents to justify the firing.

Plaintiff alleges that as a result of his statements to the committee that defendants Brown and Oden showed marked changes in how they treated plaintiff. He asserts that their conduct was calculated to cause the demise of plaintiff's division. However, plaintiff's contract was renewed on April 9, 1982, less than one month after his statements to the committee. (Plaintiff's Exhibit 5)

In a memorandum from Dr. Brown dated February 3, 1982, Dr. Hamer was removed as Director of the Environmental Academy and Dr. Brown, at that time, advised him of the need to spend more time in division development, program development and student recruiting. (Plaintiff's Exhibit 3) This change in plaintiff's position occurred prior to plaintiff's speech activity of March 15, 1982.

Student enrollment in Dr. Hamer's division, PATSD, declined from a high of 682 in the 1978–79 school year to 431 in 1979–80, 479 in 1980–81, 206 in 1981–82, and 152 in 1982–83. Overall enrollment in the college unit of SAU-Tech, of which PATSD was a division, increased from 9,031 to 15,815 during the same time period. (Defendants' Exhibit 3)

Plaintiff has acknowledged that his division did suffer low enrollment, however, he contends that the low enrollment was intentionally created by Dr. Brown. (Plaintiff's Exhibit 21, p. 3) The three factors upon which Dr. Hamer bases his contention are as follows: First, that the campus recruiter was told not to send follow-up letters to persons interested in his division; second, that only a dozen of 53 potential students were sent follow-up letters; and third, that he was told not to take any more new students into his area on September 23, 1983. Dr. Hamer also relies on an advertisement for SAU-Tech published in the

Camden News on July 13, 1983, in which his division was omitted. However, these incidents occurred after plaintiff had been given and accepted a terminal contract for the 1983–84 school year.

Dr. Brown had already made the decision to terminate the division at the end of the 1983–84 school year unless there was a significant change during the early part of that year, i.e. a substantial increase in enrollment. (Plaintiff's Exhibit 11) When Dr. Brown advised Dr. Hamer on September 23, 1983, not to take any more new students into his division who would be unable to complete the two-year program before the division was abolished Dr. Brown had finalized his decision to terminate the division. There was not a substantial increase in enrollment in the division for the fall semester of 1983. Also, according to the testimony, of the 53 alleged potential students who were not sent follow-up letters the number expressing interest in programs offered by Dr. Hamer's division and also likely to attend the school would not have constituted a substantial increase in enrollment.

After his termination plaintiff was given opportunity to appeal the decision to Dr. Harold Brinson, President of Southern Arkansas University, and to the Board of Trustees. (Plaintiff's Exhibits 19, 21; Defendants' Exhibit 1) Dr. Hamer requested and was given two hearings before the Board of Trustees and Dr. Brinson. After affording the plaintiff a full and complete hearing the Board of Trustees and Dr. Brinson concurred in Dr. Brown's decision to abolish the division and therefore terminate Dr. Hamer. Although Dr. Hamer requested reassignment to another area on the campus none was given.

The sole issue for determination by this Court is whether plaintiff was terminated because he engaged in protected speech activity in violation of the First and Fourteenth Amendments to the United States Constitution.

■ Federal courts hearing teacher or other public employee discharge cases based upon alleged violations of free speech rights have used a three step analysis in determining if the elements of a prima facie case are present. (1) The plaintiff must show that he or she has engaged in protected activity. *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) (2) The plaintiff must then show that the protected activity was a substantial or motivating factor in the actions taken against the plaintiff. *Mt. Healthy City School Dist. Board of Education v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977) (3) The burden then shifts to the public employer to show that the same action would have been taken in the absence of the protected activity. *Givhan v. Western Lines Consolidated School Dist.*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979).

In deciding whether the plaintiff has proven that he was engaged in a protected activity one factor which the Court must consider is whether the speech involved a matter of public concern. If the content of the speech is of public concern then the Court must balance the interest of the teacher in commenting upon such matters and the interest of the State, as an employer, in rendering efficient public service through its employees. *Pickering v. Board of Education*, supra. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983).

■ Six factors are to be considered in determining whether plaintiff's speech is of public concern and therefore protected speech. These include, (1) the need for harmony in the workplace; (2) the requirement of a close working relationship between plaintiff and coworkers which the speech could cause to deteriorate; (3) the time, manner, and place of the speech; (4) the context in which the dispute arose; (5) the degree of public interest in the speech; and (6) whether the speech impeded the employee's ability to perform his duties. *Id.* Before considering these six factors

**666**

the Court looks to the content of and circumstances surrounding plaintiff's speech to determine whether the subject matter on which plaintiff spoke was a matter of public concern.

The plaintiff testified before a committee of the Arkansas Fire Prevention Commission. The duties of this commission, which are set out in Ark.Stat.Ann. § 19–2166, do not include any authority over SAU-Tech or the operation of the Fire Training Academy. The Arkansas Fire Training Academy Board has the authority and responsibility to advise the Chancellor at SAU-Tech on service needs, curriculum, instructional content, and problems at the Fire Training Academy and appointment and retention of the Director of the Arkansas Fire Training Academy. Ark.Stat.Ann. § 82–854. This Board is separate from the Fire Prevention Commission.

A report and recommendation issued by the committee of the Fire Prevention Commission after its visit to the SAU-Tech campus outlines the intentions of the committee and the issues which it addressed.

The intent of the commission and the approach by the committee was to limit the scope of the study to efficient training of firefighters by the Academy and not to evaluate nonfire related issues at SAU-Tech. The committee never has nor intends to imply that this is a criminal investigation and suspects no wrong doing of any kind. (Defendants' Exhibit 8)

In a letter dated April 2, 1982, to Ms. Maria Conway, a member of the Arkansas Fire Prevention committee, Dr. Brown outlined what he understood to be the concerns of the committee which included food service, mail delivery, housing, computerization, use of bookstore, billings for room and board, oil company credit cards and telephone service. (Defendants' Exhibit 9) These are all matters of concern to the individuals involved in the administration and facilities of SAU-Tech and not necessarily matters of concern to the public.

■ Plaintiff's testimony before the committee as to his general perceptions about the campus included his perceptions of the Administration of the campus. Plaintiff's testimony concerned personnel actions taken by the administration and the allocation of funds received by the campus. These were internal matters relating only to the campus and not to the general public. Therefore, the Court finds that the subject of the statements made by plaintiff to the committee were not a matter of public concern.

■ Alternatively, if plaintiff's statements were of public concern, consideration of plaintiff's statements in accordance with the *Pickering* balancing test and the six factors outlined in *Connick,* supra, would result in a determination that plaintiff's speech is not protected under the circumstances herein.

The allegations made by plaintiff in his statements to the committee would not encourage the harmony among employees and the administration necessary for the efficient operation of a college campus. Plaintiff's position as director of a division on the SAU-Tech campus required a close working relationship with the administration and specifically, Dr. Brown. Dr. Hamer's statements about Dr. Brown and his administration of the campus could cause a deterioration of the close working relationship necessary for both parties to fulfill the duties and responsibilities of their positions.

Dr. Hamer's statements were made at a late-night meeting attended only by members of the committee, plaintiff, another instructor and the director of the Fire Academy. No public dispute had arisen concerning the matters on which plaintiff spoke nor was the meeting publicized or attended by any members of the public.

The committee was investigating only complaints received from some students of the Fire Academy about housing and food service, etc. available at SAU-Tech.

Further, plaintiff himself has stated that as a result of these statements his ability to perform his duties was impeded.

Therefore, the Court finds, in accordance with the above outlined balancing test, that any protection the plaintiff would be entitled to in regard to the statements in question would be outweighed by the interest of defendants in the efficient rendering of educational services.

The second step in plaintiff's burden of proof is to show that statements he gave to the committee, if found to be a protected activity, were a substantial or motivating factor in the defendants' decision to eliminate his division and terminate him.

Defendants have stated that the reason for the termination of the PATSD, Dr. Hamer's division, was low enrollment. Plaintiff contends that this problem was the result of the administration failing to cooperate with Hamer and placing obstacles in the way of division development and attracting students. Plaintiff states that these actions by the administration occurred after he spoke to the committee and made statements that "tended to incriminate" Dr. Brown. (Defendants' Exhibit 1) However, the evidence reveals that the steady decline in enrollment in plaintiff's division began over two years before his statements to the committee on March 15, 1982. Enrollment in the PATSD steadily declined from 682 in the 1978–79 school year to 152 in 1982–83. (Defendants' Exhibit 3) No alleged administration conspiracy born on March 15, 1982, could have caused this steady decline in enrollment. Plaintiff ignored Dr. Brown's advice that he spend more time in student recruiting and his enrollment continued to decline.

Plaintiff's statement that he had no time to recruit because he was too busy teaching is contrary to the evidence presented. In 1982–83, Dr. Hamer averaged 13 hours per semester and the normal teaching load is 13 to 15 hours. In addition plaintiff taught a four-hour internship course which required no formal in-class time allowing plaintiff time to devote to recruiting which would not take away from class time. Rather than devote any of this time to recruiting students to his division, plaintiff relied on the campus recruiter. However,

the campus recruiter's job was to interest students in the campus as a whole rather than any particular division.

As to plaintiff's contention that the division was subverted by the administration creating obstacles to increasing the enrollment the Court notes that the incidents alleged by plaintiff, as previously set out and discussed herein, occurred either after Dr. Brown had reached the decision to terminate the division or were not sufficient to constitute an explanation for the lost enrollment in the division over the past school years. Dr. Brown made the decision to terminate the division in the spring of 1983 and communicated this to plaintiff at that time along with plaintiff's terminal contract for the 1983–84 school year. Dr. Brown's decision was finalized on September 23, 1983, after the fall enrollment figures for the 1983–84 school year were available and no substantial increase in plaintiff's division was shown.

Additionally, the fact that no action was taken regarding the termination of Dr. Hamer or his division until more than one year after his speech activity is evidence that two events are not causally related. Dr. Brown extended a new contract to Dr. Hamer for the 1982–83 school year less than one month after his statements to the committee which allegedly "incriminated" Dr. Brown.

Dr. Brown did not become aware of the general content of plaintiff's remarks to the committee until the termination appeal process and he did not know the specific statements made by Dr. Hamer until after this lawsuit was filed. Dr. Brown had no reason to believe Dr. Hamer had incriminated him because plaintiff was totally unconnected with the subject of the committee's inquiry, the Fire Academy, and the committee's report absolved the administration and Dr. Brown of any wrong doing.

■ Therefore, the Court finds that plaintiff has failed to prove that his discharge by defendants was a result of his speech activity and a violation of his free speech rights. The Court is of the opinion that the evidence clearly shows that defendants' action in terminating plaintiff

and his division would have been taken even in the absence of the protected activity.

■ The Court further finds that plaintiff's contention defendants failed to follow standard practice in reassigning him after his termination in 1984 is without merit. There is no evidence of a policy of reassigning faculty members when their jobs are terminated. Furthermore, the evidence clearly shows that there were no jobs available at the time of Dr. Hamer's termination for which he was properly qualified.

A separate judgment shall be entered contemporaneously herewith.

### JUDGMENT

In accordance with the Memorandum Opinion entered this date in the above-styled cause, the Court finds that the plaintiff has failed to meet his burden of proof in establishing that his termination by defendants was a violation of his right to free speech protected by the First and Fourteenth Amendments to the United States Consitition.

IT IS THEREFORE CONSIDERED, ORDERED AND ADJUDGED that the complaint filed by plaintiff, Dr. Clyde D. Hamer, be and the same is hereby dismissed with prejudice.

Each party shall bear their own costs.