[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiffs, Eugene D'Angelo and Vincent Derosa allege that "[t]he actions of the defendants, McGoldrick and Bradford[1] subjected the plaintiffs to a transfer which was disciplinary in nature on account of the exercise by the plaintiffs' [sic] rights guaranteed by the first amendment of the United States Constitution and section 4, of the Connecticut Constitution." (Complaint, par. 13). They seek damages under Conn. Gen. Stat. § 31-51q, which provides that:
 Any employer, including the state and any instrumentality or political subdivision thereof, who subjects any employee to discipline or discharge on account of the CT Page 9022 exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the constitution of the state, provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer, shall be liable to such employee for damages caused by such discipline or discharge, including punitive damages, and for reasonable attorney's fees as part of the costs of any such action for damages. If the court determines that such action for damages was brought without substantial justification, the court may award costs and reasonable attorney's fees to the employer.
Conn. Gen. Stat. § 31-51q.
From the evidence, the court finds that while the claims of the plaintiffs are made in good faith, they does not support a recovery under General Statute 31-51q. It is apparent that while there was a feeling of animosity on the part of the defendant Captain Jack McGoldrick toward the plaintiffs, his actions did not rise to the level of discrimination under the statute.
In order to prevail on their claim, the plaintiffs must prove "(1) that [they] were exercising rights protected by the first amendment to the United States Constitution or by an equivalent provision of the Connecticut Constitution; (2) that [they were] fired `on account of' [their] exercise of first amendment or equivalent state constitutional rights; and (3) that [their] exercise of first amendment or equivalent state constitutional rights did not substantially or materially interfere with [their] bona fide job performance or with [their] working relationship with [their] employer."Daley v. Aetna Life Casualty, Superior Court, Judicial District of Hartford-New Britain at Hartford, Docket No. 0533693 (August 3, 1994, Sheldon, J.), citing Vince v.Worrell, Superior Court, Judicial District of Hartford-New Britain at Hartford, Docket No. 319386 (July 14, 1992, Schaller, J.). CT Page 9023
 I
"The first step in analyzing a claim under General Statutes § 31-51q is to determine whether the rights exercised fall under the protection of thefirst amendment of the United States constitution or section . . . 4 . . . of the Connecticut constitution." Lebow v.American Chemical Refining Co., Inc., 12 Conn. L. Rptr. No. 9, 277, 279 (September 26, 1994) "Whether or not an employee's statements are constitutionally protected depends upon their content, their form, and the content in which they are made." Daley v. Aetna Life Casualty,
at 5, citing Connick v. Meyers, 461 U.S. 138, 147,103 S.Ct. 1684 (1983). This court has repeatedly held that an employee's speech and activities are not constitutionally protected unless they "relate to matters of public concernand are voiced in such a manner as to contribute to the public discussion thereof." Daley v. Aetna Life Casualty, at 5. "If, by contrast, they relate solely to the employee's personal employment situation, and/or are so communicated as to affect only the private adjustment of the employee's personal grievances, they are not constitutionally protected." Id. at 5-6. See also Vincev. Worrell, supra; Cassetto v. Winchester Board ofEducation, 13 Conn. L. Rptr. No. 1, 4 (January 2, 1995). [T]he issue is whether acting as he did, an employee was acting as a citizen attempting to speak out on a public issue, or whether the employee was instead attempting to resolve a private dilemma relating to employment."Bakelman v. Paramount Cards, Inc., 12 Conn. L. Rptr. No. 3, 98 (August 15, 1994) (footnote omitted). In Bakelman,
the Court suggested that the use of the nomenclature "matter of public concern," which has evolved from the caselaw, should be modified, "as it has an unfortunate tendency to confuse the issues being analyzed by the courts in cases of this sort." The use of this shorthand term tends to erroneously suggest that the inquiry is solely focused on whether the plaintiff was exercising rights on a matter as to which the public is interested. Court rulings that a plaintiff was not acting on a "matter of public concern," as that term of art is used, might have a tendency to be misunderstood and to erroneously lead to the impression that courts are minimizing the importance of full and robust discussions CT Page 9024 of many issues of importance to the public. In fact, the inquiry is broader, focusing on whether a plaintiff, in acting as he or she did, was acting as a citizen pursuing private interests.
Rep. Tulisano, a sponsor of the statute, stated that the statute "makes it clear that they [employees] do have in fact a cause of action against an employer, and that is exercise of rights which have no way to do with job performance, or on the job, or interfering with their employment." 26 Conn. H.R. Proc., pt. 15, 1983 Sess. 64 (May 19, 1983) (remarks of Rep. Tulisano).
The evidence presented at trial, particularly the testimony of the plaintiffs, fails to support their claim that their speech and activities were constitutionally protected. There is no dispute that the defendant, Captain McGoldrick, made the final decision to recommend the immediate transfer of the plaintiffs on February 9, 1993, although the evidence suggests that he had decided on February 4, 1993, to recommend such transfer at a time in the not very distant future. The activity which the plaintiff D'Angelo claims resulted in his transfer was his relating to Sergeant McGuire information regarding a statement allegedly made by Sergeant Petroski several years earlier. Appendix A. That statement had to do with Sergeant Petroski's alleged suspicion that another trooper might pass confidential information along to a criminal suspect. It is important to note the following facts pertaining to this communication. First, Trooper D'Angelo, in conveying this information was motivated by a desire to undermine the credibility of Sergeant Petroski, whose charges led to the re-opening of an internal affairs investigation of which Sergeant McGuire was the subject, and to undermine Sergeant Petroski's transfer to the internal affairs unit. Trooper D'Angelo's statement to Sergeant McGuire was not "voiced in such a manner as to contribute to the public discussion" of any issue, but was designed solely to perpetrate the long-standing and on-going feud between Sergeants McGuire and Petroski. In fact, Trooper D'Angelo testified that the statement at issue was made by Sergeant Petroski in 1988, five years before the plaintiff told Sergeant McGuire about it. Trooper D'Angelo's failure to reveal this information earlier demonstrates that he had no intention CT Page 9025 of contributing to the public discussion of the issue.
It is also important to note that the plaintiffs signed the McGuire memo on the afternoon of February 10, 1993, after Captain McGoldrick had informed them that they would be transferred. Thus, that action could not have been a factor in Captain McGoldrick's decision.
Similarly, the plaintiff, Vinent DeRosa, testified that in early February 1993, he provided Sergeant McGuire with certain information regarding alleged wrongdoing by Sergeant Petroski. It is undisputed that in February 1993, Sergeant McGuire was not assigned to the internal affairs unit, nor was he in the plaintiffs' chain of command. The rational explanation for Trooper DeRosa's action was that he was providing his close friend, Sergeant McGuire, with ammunition to use in his feud with Sergeant Petroski. If Trooper DeRosa was motivied [motived] by any desire to "contribute to the public discusison [discussion] of" Sergeant Petroski's alleged deeds, he would have utilized the more logical options of reporting this information through his chain of command or going directly to the internal affairs unit when he became aware of it, not months or years later.
The Court may properly consider the plaintiff's motive in determining the form, content and context of the alleged protected activity. In Dodds v. Childers,933 F.2d 271, 2373 (5th Cir. 1991), the Court held that a speaker's primary motivation may be considered when detemining [determining] whether a letter written by the plaintiff addressed a matter of public concern. In that case, the Court concluded that the letter-writer, the plaintiff, was more "concerned with her job security and working conditions than with any issue in the public interest." Such is the case here. The plaintiffs in the instant case seek to elevate an internal feud among employees into a constitutional issue. Their approach has consistently been rejected by several courts in the cases cited above.
 II
Even assuming arguendo that the plaintiffs' speech and/or activities were constitutionally protected, they have failed to meet their burden of proving that they CT Page 9026 were transferred because of the exercise of those protected rights. The evidence presented demonstrates that Captain McGoldrick, at the time he made the decision to transfer the plaintiffs, was unaware that the plaintiffs had provided Sergeant McGuire with the information regarding Sergeant Petroski. A number of facts support such a conclusion. First, Captain McGoldrick testified that from the time he assumed command of the SNTF in September 1993, he was concerned about the low productivity of the northwest office and the reports he was receiving of feuding among staff members. He concluded that there was a causal connection between the two. In late December 1992 or early January 1993, in order to alleviate the staff problems at the northwest office, Captain McGoldrick instructed Sergeant Petroski to put in for a transfer from that unit. As soon as Sergeant Petroski's transfer was announced, Captain McGoldrick removed him from the northwest office and assigned him to administrative duties during the two week waiting period before the transfer became effective. On February 4, 1993, Captain McGoldrick met with Lieutenant Burnham, Master Sergeant Lavin, Sergeant Coyle and Sergeant Kinney, Petroski's replacement, and identified four troopers who were to be assigned to the northwest office in the near future. Two of these troopers, Pina and Shaggy, were transferred to the unit to replace the plaintiffs on February 10, 1993. The third, Trooper Voket, was transferred to the northwest office in March 1993. The fourth, Trooper Arroyo, was assigned to the south central office after Captain McGoldrick determined that the other trooper in that unit, Trooper Bennett, was not a cause of the disruption in the northwest office and decided to keep him there. Lieutenant Burnham and Master Sergeant Lavin, who were present at the February 4 meeting, both supported Captain McGoldrick's testimony that his decision to transfer the plaintiffs was made at that meeting, which took place days before Sergeant McGuire's February 9 visit to the internal affairs unit.
The plaintiffs point to the failure of Captain McGoldrick to transfer Sergeant Coyle from the northwest office as evidence that he retailiated [retaliated] against the plaintiffs for their role in the internal affairs investigation regarding Sergeant Petroski. However, this argument is illogical because on the morning of February CT Page 9027 10, 1993, when Captain McGoldrick told the plaintiffs of their transfers, Sergeant Coyle was in the same situation as the plaintiffs; that is, Sergeant Coyle's signature line was on Sergeant McGuire's memo. Until he declined to sign the memo later on February 10, Sergeant Coyle was, at least in the minds of Sergeant McGuire and the plaintiffs, one of the co-conspirators in the coup.
Further, Captain McGoldrick testified that he first learned of the plaintiffs' involvement in the Petroski internal affairs matter on March 17, 1993, when Lieutenant Burnham interviewed him in connection with that investigation. Lieutenant Burnham testified that Captain McGoldrick appeared to be surprised to learn of their involvement.
The plaintiffs claim is based on the statements allegedly made by Captain McGoldrick when he met with them on the morning of February 10. It is undisputed that Captain McGoldrick stated at the time that he was "tired of the recriminations." Captain McGoldrick testified that he was referring to what he perceived to be continuous and on-going in-fighting and resulting disruption in the northwest office. This explanation is credible when one considers the nature of the reports being provided to him by Master Sergeant Lavin and Sergeant Coyle. In fact, it was Master Sergeant Lavin's report to Captain McGoldrick on February 9, 1993, that the plaintiffs had been caught copying Sergeant Petroski's routines, that was the "final straw." Upon hearing of this incident, Captain McGoldrick concluded that the "feud" was continuing and that the plaintiffs were still being distracted by it, even after Sergeant Petroski had left the unit. At that point, Captain McGoldrick made the decision to request the immediate transfer of the plaintiffs rather than to wait until the transfers contemplated on February 4 became effective.
In the absence of any evidence to support their claim that the plaintiffs were transferred on account of their alleged protected activity, their claim must fail.
 III
Section 31-51q prohibits an employer from subjecting CT Page 9028 any employee to "discipline or discharge" on account of the exercise of certain protected rights. The plaintiffs cannot prevail on their claim because a transfer from the one assignment to another is not discipline or a discharge.
It is undisputed that the plaintiffs suffered no loss of rank or base pay as a result of their transfers. Their only monetary loss that they have claimed is overtime pay as a result of their working less overtime in their new assignments. However, both plaintiffs readily admitted at trial that overtime was available to them in their new assignments but that they chose not to work overtime. Under these circumstances, they cannot claim that their transfers constituted discipline.
Furthermore, it is clear from the testimony of numerous state police officers that transfers in the Connecticut State Police are a common occurrence. Virtually every state police officer who testified had been transferred on numerous occasions through their careers. In fact, Master Sergeant Lavin testified that he had recently been transferred from the SNTF to a troop position, just as the plaintiffs were, and did not consider such transfer to be disciplinary in any way. The transfers that are the subject of this action are not the type of action that § 31-51q was intended to address.
 IV
Section 31-51q prohibits employers from disciplining or discharging an employee on account of the exercise of certain protected rights only if the employee's "activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer . . . ." This point was emphasized by Rep. Tulisano in his remarks before the House of Representatives. Rep. Tulisano stated that the purpose of the statute was to protect employee activities "which have no way to do with job performance or on the job, or interfering with their employment." 26 Conn. H.R. Proc, pt. 15, 1983 Sess. 64 (May 19, 1983) (remarks of Rep. Tulisano). As this Court has noted, "[i]t is apparent that the legislature intended that § 31-51q be narrowly construed" so as not to CT Page 9029 interfere with the rights of employers. Epworth v.Journal Register Company, 12 Conn. L. Rptr. 585, 586 (November 28, 1994).
The testimony of Captain McGoldrick, Master Sergeant Lavin and Sergeant Coyle demonstrates that during the period prior to February 10, 1993, there was disruption and disharmony in the Northwest office. The hostility and lack of trust between Sergeant Petroski and the plaintiffs was apparent to everyone associated with the office. Even Sergeant Coyle admitted that the working conditions in the Northwest office were problematic.
Captain McGoldrick was made aware of the situation after assuming command of the SNTF and, based upon the reports he was receiving from Master Sergeant Lavin, reasonably believed that the plaintiffs were at least partly responsible for the problems. It was reasonable for Captain McGoldrick to conclude that the productivity problem in the northwest office was caused, at least in part, by the hostility among the staff there. The provisions of § 31-51q cannot be interpreted to restrain the commanding officer of a narcotics unit from making staff changes which he reasonable believes are necessary to accomplish the mission of the office.
 V
Section 31-51q does not contain a definition of the term "employer" as it is used in the statute. However, the statute does provide that the term employer includes "the state and any instrumentality or political subdivision thereof." An action under § 31-51q cannot be maintained against either of the two named defendants because neither was the plaintiffs' employer in February 1993.
Black's Law Dictionary, 5th Edition, defines "employer" as "[o]ne who employs the services of others; one for whom employees work and who pays their wages or salaries." Captain McGoldrick is not an employer. Captain McGoldrick did not pay the salaries or wages of the plaintiffs, nor did he have authority to hire or discharge them. In fact, the evidence demonstrates that Captain McGoldrick did not even have the final authority CT Page 9030 to transfer the plaintiffs, but merely recommended the transfers to Major Bradford, who obtained final approval for the transfers from Lieutenant Colonel Root.
Furthermore, even if we assume that Captain McGoldrick was an agent of the State, this Court has previously determined that § 31-51q does not authorize an action against an employer's agent. In Epworth v. JournalRegister Co., 12 Conn. L. Rptr. 585 (November 28, 1994), the plaintiff brought a claim under § 31-51q against a newspaper publisher who had allegedly fired her for writing and publishing an article critical of the newspaper. The Court in that case determined that the plaintiff's claims against the publisher were legally insufficient, holding that "[a] cause of action founded upon § 31-51q . . . lie[s] only against a plaintiff's employer." Id. at 587.
For the same reason, the plaintiffs cannot prevail on their claim against the defendant Cioffi. The statute clearly authorizes a cause of action against an employer; in this case, the State of Connecticut. The Court has no jurisdiction over any other person or entity under the statute.
For the reasons stated, judgment may enter for the defendants.
PICKETT, J.
APPENDIX A
DATE: Feb. 09, 1993
TO: M/SGT. WILLIAM CANNON LT. R. LYDING Executive Officer Commanding Officer Troop I, Bethany Barracks
FROM: SGT. WILLIAM McGUIRE Day Shift Supervisor Troop I, Bethany Barracks
SUBJECT: ALLEGATIONS CONCERNING SGT. JOHN PETROWSKI (currently assigned to the S.N.T.F.) ========================================================== CT Page 9031
Sirs,
Since the re-opening of my Internal Affairs Investigation (IA-92-051) and the initiation of a new IA case number concerning allegations made by Sgt. John Petrowski about the integrity of a CSP trooper; information has been brought to my attention.
From the time frame immediately preceding and following my interviews with Internal Affairs on Wed. 02/03/93, I received numerous phone calls at my residence from various State Police and local police personnel. A callers are expressing a genuine concern about the fact that Sgt. John Petrowski is being assigned to the CSP Internal Affairs Unit. Many of the callers go on to say that they are recently aware of the fact that Sgt. Petrowski is involved in certain procedural and criminal activities that should be addressed by the Internal Affairs Unit, and they stated their ability to substantiate said allegations. After becoming knowledgeable of the severity of these allegations, I felt it was incumbent upon me as a supervisor of this agency, to forward this information to the proper authorities.
On Tuesday, February 08, 1993, I verbally related these allegations to Lt. Jonathan Schweitzer at the Internal Affairs Office in Meriden. Lt. Schweitzer advised that same should be reduced to writing and submitted through the chain of command.
The allegations are as follows:
1. That Sgt. Petrowski has been falsely reporting overtime on his weekly routines for hours he actually did not work. That this violation caused the other field office sergeant to refuse to sign off on Sgt. Petrowski's routines. Sgt. Petrowski then started authorizing his own routines by double signing same. However, the authorizing signature was disguised so as not to look like his own name. That the overtime hours are sometimes signed off to bogus case numbers, ie: intelligence, and other cases he is not actually working. CT Page 9032
2. That Sgt. Petrowski also signs off on his wife's routines as she is the part time clerk of the same field office he is assigned. That she is given comp. time off by Sgt. Petrowski, as a part-time employee, when she doesn't work extra hours to earn same. That she is not at work at times that her routines shows she is working.
3. That Sgt. Petrowski was away at school while the Commanding Officer of SNTF was also at the same school. That the C.O. observed that Sgt. Petrowski failed to attend certain training and when questioned about same, Petrowski stated that he went golfing. That Sgt. Petrowski then submitted overtime on his routine for the time he was away at this school; to which the commanding officer refused the routine.
4. That Sgt. Petrowski frequently utilizes state funding to pay for his consuming of alcoholic beverages at bars and writes same off on daily reports.
5. That Sgt. Petrowski is seldom around the field office and or available to assist the men assigned to same with tasks such as search warrants and other related undercover operations.
6. That Sgt. Petrowski allows unsafe work habits during undercover operations in so far as not supplying adequate cover officers.
7. That Sgt. Petrowski attended the CSP golf tournament in 1992 until late evening hours but yet his routine for that date shows him working a normal evening shift.
8. That Sgt. Petrowski is recently making allegations that the integrity of a trooper was questioned during the narcotics investigation of Richard Scianna by members of this agency. However, Sgt. Petrowski himself has made allegations in public concerning the integrity of the same trooper.
9. That this writer has received two separate phone calls to my residence advising me that Sgt. Petrowski has made allegations that he would see to it that I am CT Page 9033 never promoted.
10. That members of SNTF N/W field office receive information that he will be transferred out of SNTF and that he was given an opportunity to choose where he would like to go. That he chose to go to Internal Affairs and a short time later a teletype message is sent showing his transfer to same.
11. That Sgt. Petrowski makes allegations regarding initiating case numbers on members of the SNTF N/W office, and threatens to do so when is at Internal Affairs.
12. That Sgt. Petrowski has alienated a positive working relationship with Valley Street Crime Unit that had been cultivated during the previous administration.
All of these allegations have been brought to my attention and can be substantiated by the following CSP personnel, and or audits performed on Sgt. Petrowski's routines, telephone credit card, and car phone records.
The following personnel have stated their willingness to be interviewed by Internal Affairs Unit regarding these allegations
Captain M. Tyszka (WDHQ)
Sgt. D. Coyle (SNTF N/W)
Det. V. DeRosa (SNTF N/W)
Det. G. D'Angelo (SNTF N/W)
Respectfully submitted,
Sgt. William T. McGuire #187 CSP Troop I, Bethany