135 Cal.Rptr.2d 187 (2003)
109 Cal.App.4th 692
Hector ESCALANTE, Plaintiff and Appellant,
v.
WILSON'S ART STUDIO, INC., Defendant and Appellant.
No. G029742.
Court of Appeal, Fourth District, Division Three.
June 9, 2003.
Rehearing Denied July 3, 2003.
Review Denied September 10, 2003.[*]
*188 Law Offices of Gary S. Bennett and Gary S. Bennett, Santa Ana, for Defendant and Appellant.
Mark Weidmann, Los Angeles, for Plaintiff and Appellant.

OPINION
BEDSWORTH, Acting P.J.
An employer's right to terminate an "at-will" employment relationship is largely unfettered. For the most part, the decision can be both arbitrary and unwiseas it may have been in this casewithout being actionable. The courts have limited an employer's right of termination only to the extent its exercise is based upon considerations antithetical to societal interests, such as unlawful discrimination or an employee's refusal to engage in wrongful or criminal conduct. This appeal raises the question of whether an employer can terminate an at-will employee for exercising his constitutionally-guaranteed right to self-defense.
Wilson's Art Studio, Inc., appeals from a judgment in favor of Hector Escalante for wrongful termination in violation of public *189 policy. The jury found that Escalante's employment was terminated because he chose to engage in self-defense rather than continue his initial retreat from a coworker's physical attack. While we sympathize with Escalante and find his decision understandable, we cannot say the employer's policy against employee fighting, even in self-defense if retreat is possible, violates any public policy. It cannot, therefore, be the basis of a wrongful termination claim.
The judgment is reversed, obviating resolution of Wilson's secondary claim that the trial court erred in allowing Escalante to recover damages for his physical injuries, inflicted by the coworker, as part of the wrongful termination claim. Similarly, we need not address Escalante's cross-appeal challenging the judgment notwithstanding the verdict which was granted on the issue of punitive damages.

* * *
Escalante began working as a printer at Wilson's in 1996. During his employment, Escalante was a good worker, did not create any trouble, and was viewed by management as a "relatively passive personality." In February of 1999, Escalante was physically attacked by another employee, Ion Stanei, without provocation. It was not the first time Stanei had attacked a coworker. Approximately eight years earlier, Stanei had attacked another employee, Francis Vu, inflicting injuries serious enough to require stitches. Both Stanei and Vu continued working for Wilson's after that incident.
According to Escalante, the incident at issue in this case began when Stanei approached Escalante and another worker and started screaming at them. Stanei then grabbed a piece of wood and began swinging it at Escalante, possibly hitting him in the arm. Stanei then took up either a hammer or a box of screws and hit Escalante with it. At that point, Escalante fled the room, but Stanei began following him. When Escalante was about 30 to 40 feet away from Stanei, Stanei threw a box of screws, hitting Escalante in the back. At that point, Escalante stopped his flight, turned around and saw Stanei holding a large metal cap. Escalante then rushed toward Stanei, grabbing him in a bear hug in an attempt to restrain him. Stanei immediately struck Escalante in the head with the cap, splitting the skin on his skull and causing substantial bleeding. It is undisputed that Escalante did not hit Stanei.
Jim Goetsch, a member of the family that owns Wilson's, interviewed witnesses, including Escalante, in the wake of the incident. Based on their trial testimony, there appears to have been some difference of opinion among the witnesses as to whether Escalante had intended to fight with Stanei when he turned back (and just had no opportunity to strike a blow before getting clocked) or merely sought to prevent Stanei from pelting him with additional objects. According to Goetsch, Escalante himself initially stated that "he got mad when he got hit with a box of screws and that he went back to fight." After hearing these differing perspectives, the jury apparently concluded that Escalante was seeking only to defend himself in the conflict, even when he chose to turn and rush back toward Stanei rather than continuing his retreat.
Nonetheless, Goetsch decided to fire Escalante after hearing his side of the story, "because he did not continue to leave the scene.... He made a decision to go back. And that is not a decision I agreed with."
Although Escalante's complaint alleged several causes of action, the case was submitted to the jury on only one theory, wrongful termination in violation of public policy. The jury was asked to render a *190 special verdict, and the key issues were presented within a single rather tortuous question: "At the time the decision was made by [Wilson's] to terminate Hector Escalante's employment, did [Wilson's] act in good faith, following an investigation that was appropriate under the circumstances, and have reasonable grounds for believing [Escalante] became the aggressor in the fight when he went back toward [Stanei] and was not acting in self-defense?" The jury answered that question "no."
The jury then found the wrongful termination of his employment caused Escalante to suffer past and future medical damages totaling $86,150, lost earnings of $75,000, and past and future pain and suffering totaling $205,710. The jury also concluded that Wilson's acted with fraud, malice or oppression sufficient to sustain an award of punitive damages.
Wilson's moved for a judgment notwithstanding the verdict and a new trial. The new trial motion argued that the right of self-defense was not the type of public policy which would support a claim for wrongful termination. It also asserted that the amount of damages awarded was excessive. The court rejected the first argument but ruled that a new trial on damages would be ordered unless Escalante agreed to a reduction in the amounts awarded for lost earnings and future medical damages. Escalante agreed. The court also granted the motion for judgment notwithstanding the verdict on the issue of punitive damages, reasoning that the evidence of fraud, malice or oppression was insufficient as a matter of law to satisfy the clear and convincing standard.
The primary issue raised on appeal is whether Escalante's exercise of his right of self-defense, guaranteed by our Constitution and recognized in our Penal Code, is the type of "public" interest that would support a claim for wrongful termination in violation of public policy.
We start with the basic presumption, expressed in Labor Code section 2922, that "employment, having no specified term, may be terminated at the will of either party on notice to the other." As recently explained by our Supreme Court, so-called "at will" employment may be terminated for nearly any reason, even a bad one, or for no reason at all. "Labor Code section 2922 establishes the presumption that an employer may terminate its employees at will, for any or no reason. A fortiori, the employer may act peremptorily, arbitrarily, or inconsistently, without providing specific protections such as prior warning, fair procedures, objective evaluation, or preferential reassignment." (Guz v. Bechtel National, Inc. (2000) 24 Cal.4th 317, 350,100 Cal.Rptr.2d 352, 8 P.3d 1089.)
However, as explained in Foley v. Interactive Data Corp. (1988) 47 Cal.3d 654, 254 Cal.Rptr. 211, 765 P.2d 373, the power of at will termination is not absolute. "[T]he employer's right to discharge an `at will' employee is still subject to limits imposed by public policy, since otherwise the threat of discharge could be used to coerce employees into committing crimes, concealing wrongdoing, or taking other action harmful to the public weal." (Id. at p. 655, 254 Cal.Rptr. 211, 765 P.2d 373, italics added.)
As this language indicates, the public policy exception to at-will employment is itself quite narrow. Specifically, Foley explains that it is not enough to demonstrate that some statutory policy is violated by the termination: "Even where, as here, a statutory touchstone has been asserted, we must still inquire whether the discharge is against public policy and affects a duty which inures to the benefit of the public at large rather than to a particular *191 employer or employee. For example, many statutes simply regulate conduct between private individuals, or impose requirements whose fulfillment does not implicate fundamental public policy concerns. Regardless of whether the existence of a statutory or constitutional link is required under Tameny [v. Atlantic Richfield Co. (1980) 27 Cal.3d 167, 164 Cal.Rptr. 839, 610 P.2d 1330], disparagement of a basic public policy must be alleged...." (Foley v. Interactive Data Corp., supra, 47 Cal.3d at p. 669, 254 Cal.Rptr. 211, 765 P.2d 373.)
The employee in Foley alleged he was terminated for reporting to upper management that his new supervisor was under investigation by the Federal Bureau of Investigation for embezzlement in the course of prior employment. In determining whether such conduct affected public, rather than private, interests, the court suggested it is helpful to consider whether the employer and employee could have entered into an enforceable agreement prohibiting the employee from engaging in the conduct. If no public policy would preclude enforcement of such a prohibition, then there is no public interest that would preclude termination of employment for engaging in the conduct. Applying that test, the court determined Foley could not state a claim.
"The absence of a distinctly `public' interest in this case is apparent when we consider that if an employer and employee were expressly to agree that the employee has no obligation to, and should not, inform the employer of any adverse information the employee learns about a fellow employee's background, nothing in the state's public policy would render such an agreement void. By contrast, in the previous cases asserting a discharge in violation of public policy, the public interest at stake was invariably one which could not properly be circumvented by agreement of the parties. For example, in Tameny, supra, 27 Cal.3d 167, 164 Cal.Rptr. 839, 610 P.2d 1330, a contract provision purporting to obligate the employee to comply with an order of the employer directing the employee to violate the antitrust laws would clearly have been void as against public policy, and in Petermann [v. International Brotherhood of Teamsters (1959) 174 Cal. App.2d 184, 344 P.2d 25], a contract provision which purported to obligate the employee to commit perjury at the employer's behest would just as obviously have been invalid. Because here the employer and employee could have agreed that the employee had no duty to disclose such information, it cannot be said that an employer, in discharging an employee on this basis, violates a fundamental duty imposed on all employers for the protection of the public interest." (Foley v. Interactive Data Corp., supra, 47 Cal.3d at pp. 670-671, fn. 12, 254 Cal.Rptr. 211, 765 P.2d 373.)
In this case, we agree that the laws of our state certainly allow one to engage in self-defense. That right is reflected in our Constitution: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." (Cal. Const., art. I, § 1.) Similarly, Penal Code section 693 makes clear that "[resistance sufficient to prevent [a public offense] may be made by the party about to be injured."
Furthermore, the concept of "selfdefense" as developed by California law includes the right not to retreat from danger, even if retreat is possible and would be safer. Our standard jury instruction on this issue provides: "A person threatened with an attack that justifies the exercise of the right of self-defense need not retreat. In the exercise of [his] right of self-defense *192 a person may stand [his] ground and defend [himself] by the use of all force and means which would appear to be necessary to a reasonable person in a similar situation and with similar knowledge; and a person may pursue [his] assailant until [he] has secured [himself] from danger if that course likewise appears reasonably necessary. This law applies even though the assailed person might more easily have gained safety by flight or by withdrawing from the scene." (CALJIC No. 5.50.)
However, we find nothing in any of these provisions that specifically encourages individuals to exercise their right of self-defense in a given situation for the benefit of the public. Not every right guaranteed to citizens by statute, or even the Constitution, is one which society has a rooting interest in seeing exercised. For example, the right of privacy (also contained in art. I, § 1 of our Constitution) includes a woman's right to have an abortion. (American Academy of Pediatrics v. Van de Kamp (1989) 214 Cal.App.3d 831, 263 Cal.Rptr. 46.) But that does not mean society is encouraging abortion. Instead, it is merely allowing the decision to be made by individuals, according to their own interests.
Similarly, the Penal Code provisions do nothing more than establish that reasonable self-defense is not itself a crime. But exempting certain conduct from criminal sanction is not the same as advocating it. And because the concept of self-defense governs even situations where retreat would be a safer option than resistance, we cannot say that society would always encourage resistance. If a person had the opportunity to flee danger, would he owe it to society to stand his ground?
The parties cite no cases involving employment termination based upon an employee's assertion of a right of self-defense. However, both the California and United States Supreme Courts have concluded that the constitutional right of free speech, which certainly seems at least as deeply rooted and important, may be subject to restriction in the workplace. In Connick v. Myers (1983) 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708, the U.S. Supreme Court concluded that even a government employer could restrict an employee's free speech rights, after balancing the employee's interest in commenting about matters of public concern against the employer's interest in promoting the efficiency of its workplace. In Aguilar v. Avis Rent A Car System, Inc. (1999) 21 Cal.4th 121, 87 Cal. Rptr.2d 132, 980 P.2d 846, our Supreme Court held that an injunction prohibiting certain offensive racial language within a workplace was not an unlawful prior restraint of free speech. As the court noted, "[although stated in broad terms, the right to free speech is not absolute." (Id. at p. 134, 87 Cal.Rptr.2d 132, 980 P.2d 846.)
Indeed, it is clear that others of our constitutional rights are subject to some reasonable restrictions in the workplace. Among those listed alongside self-defense and privacy are "enjoying ... life" and "obtaining ... happiness." (Cal. Const., art. I, § 1.) But no one would seriously contend that public policy prevents an employer from reasonably restricting our exercise of those rights during work hours.
As both Connick and Aguilar make clear, an individual's exercise of a constitutional right is not a single immutable thing that must be either entirely embraced or entirely condemned by society. Circumstances do count. For example, although society benefits from and encourages our participation in public debate about issues of widespread concern, it merely tolerates an individual's public use of racial epithets. Even if the Constitution protects such public expression, most of us would agree it is *193 actually harmful to the public weal. Change that setting to a workplace, and we might all agree that public policy would not allow an individual to hurl those epithets at his coworkers without fear that his employment might be terminated.[1]
The same is true of self-defense. The issue is not whether it can be characterized abstractly as a good thing or a bad thing. There may be some circumstances under which an employee's decision to engage in self-defense would be promotive of a public policy. For example, if an employee were backed into a corner by his attacker, with no means of escape, we might agree that the general policy favoring the preservation of human life would prevent his employer from firing him for fighting back in self-defense. Public policy might not allow an employee to bargain away his right to self-protection in those circumstances. But this case does not present those circumstances.
In this case, the precise issue to be considered is an employee's exercise of his right not to retreat from a fight; i.e., whether that specific aspect of the "right of self-defense" promotes the public interest. It is undisputed that Escalante was 30 or 40 feet away from Stanei when he chose to abandon his retreat and run back toward Stanei. Hence, it cannot be persuasively asserted that retreat was not an option. We see no reason why the public interest is harmed by a requirement that employees must avoid physical conflict, whenever possible, in the workplace. To the contrary, if retreat is possible, it is generally the safer choice, for the victim as well as others who might be drawn into the fight. Retreat might not serve the victim's pride, or assuage his anger at being attacked, but it does tend to prevent escalation of the violence, and we cannot see why an employer should not be allowed to opt for that result.
After all, the maintenance of a safe workplace, for the benefit of all employees, is an important interest that could not be bargained away. Escalante's decision to abandon his retreat and fight back may have benefited him personally, but it did not tend to promote workplace safety. For this reason, we conclude the statutes imposing upon employers a duty to maintain a safe work place actually work against Escalante, rather than supply him with the public policy to sustain his claim. (See, e.g., Lab.Code, § 6401, which provides in pertinent part that "[e]very employer shall do every other thing reasonably necessary to protect the life, safety, and health of employees.")
There is simply no basis to conclude, as Escalante seems to assume, that the right of self-defense always promotes safety. Ironically, in this very case it did not. To the contrary, as explained above, the "selfdefense" label is applied even in situations where the individual could flee, and the decision to stand his ground exposes him (and perhaps others) to greater danger. That is precisely why the right of selfdefense, while offered, is not necessarily encouraged in those situations. And that is also why an employer which gave its employees the option to choose "fight" over "flight" when confronted with workplace violence, might itself be violating public policy.
Escalante's own lawyer framed the issue this way, in a question probing Goetsch's motivations for firing Escalante: "Isn't what you're upset about was that the ... *194 choice Mr. Escalante made in defending himself ... resulted in more damage to Mr. Escalante which you were concerned would cost Wilson's Art Studio more money and that is why you terminated Mr. Escalante?" Although Goetsch rejected the implication his concerns were entirely financial, we believe that employers are in fact entitled to, and should, concern themselves with (1) whether the choices made by employees in the workplace will subject them and other employees to increased danger of injury; and (2) minimizing the expenses associated with employee injuries. In short, Wilson's did not violate public policy by requiring all its employees, including Escalante, to avoid violent conflict whenever possible.
The judgment is reversed. Each party is to bear its own costs on appeal.
WE CONCUR: FYBEL and IKOLA, JJ.
NOTES
[*] In denying review, the Supreme Court ordered that the opinion be not officially published. (See California Rules of CourtRules 976 and 977).
[1] Indeed, workplace speech is very problematic. Not only is encouragement of public debate on the job likely to be figuratively and literally injurious, talking of any kind may endanger others. For example, many employers have a well-founded safety policy that prohibits talking on an assembly line.