NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0002n.06
Filed: December 28, 2007

No. 06-1491

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

THOMAS L. HABEL; DAVID W. )
HERCZEG; KENNETH G. )
MEERSCHAERT, SR.; GEOFFREY E. )
SMITH, )
  )
    Plaintiffs-Appellees, )
  )
v. )
  )
TOWNSHIP OF MACOMB, )
  )
    Defendant, )
  )
JOHN D. BRENNAN; MICHAEL D. )
KOEHS; RAYMOND A. AHONEN, )

    Defendants-Appellants.

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN

Before: KEITH and ROGERS, Circuit Judges; and ALDRICH, District Judge.[*]

**Rogers, Circuit Judge.** This interlocutory appeal from the district court's denial of qualified

immunity involves four township firefighters who claim that the supervisor, clerk, and fire chief of

Macomb Township, Michigan, retaliated against them for public criticism of how the fire department

was run, in violation of their First Amendment right to free speech. The officials moved for

summary judgment on the alternative grounds that the plaintiffs' constitutional rights were not

---

[*]The Honorable Ann Aldrich, United States District Judge for the Northern District of Ohio,
sitting by designation.

violated and that the individual defendants were entitled to qualified immunity. The district court denied the officials' motion, finding that the officials were not entitled to qualified immunity, and that there was a genuine issue of material fact as to whether the plaintiffs' constitutional rights were violated. Only the question of qualified immunity is now before this court. On the present record, the officials are not entitled to qualified immunity, and the district court therefore properly denied summary judgment on that ground.

This lawsuit was brought by Thomas L. Habel, David W. Herczeg, Kenneth G. Meerschaert, and Geoffrey E. Smith, four current and former firefighters with the Macomb Township Fire Department. The defendants are John Brennan, the township supervisor, Michael Koehs, the township clerk, and Raymond Ahonen, the township's fire chief.

Plaintiff Meerschaert alleged that he was subjected to discipline, including a 45-day suspension, for activity that included voicing public concerns to township officials and the media. Meerschaert was first hired as a part-time firefighter in 1981. In 1990, he became a full-time firefighter with the rank of maintenance sergeant, a position he held until 1995, when he was promoted to captain. Upon the recommendation of Chief Ahonen, he was promoted to assistant chief in 2000. He and Ahonen initially had a good relationship, as they both shared the same goals for the fire department. They also shared similar concerns, such as firefighter training issues, the response times of the ambulance company, the response times of the fire company, and firefighter safety. Meerschaert was particularly concerned about training because he believed that the absence of a significant number of firefighters from training sessions posed a danger to public safety. He and

his co-plaintiffs were also concerned about defective fire fighting equipment and a lack of manpower in the department.

Meerschaert's relationship with Ahonen began to deteriorate after an emergency incident involving Meerschaert's daughter-in-law in 2002. Meerschaert's daughter had placed an emergency call stating that his daughter-in-law was choking and could not talk or breathe. An ambulance responded, but no responders from the fire department ever arrived. Meerschaert's distress over that incident was accentuated shortly thereafter when a firefighter tried to adjust the height of a hydraulic ladder while it was in use during a fire, thereby nearly causing a severe injury to the firefighter who was climbing on it. Those incidents spurred Meerschaert to speak out publicly and privately about his concerns. He suggested to Ahonen that they speak to the entire township board, but Meerschaert claims that Ahonen replied that he would not speak to the board because he was afraid of Brennan and could not afford to get fired.

Without Ahonen by his side, Meerschaert took his concerns to several township officials, including Brennan and Koehs. He also spoke to the media and to the community in general, urging the citizens of the township to tell their elected officials that the township needed more fire fighters and better ambulance response times.

On October 28, 2002, Meerschaert attended a township meeting to voice his concerns, but he felt compelled to leave the meeting because of the hostility exhibited toward him by Brennan. Meerschaert contends that within two days he was subjected to the following disciplinary actions:

1) he was disciplined for not signing off over the air; 2) he was reprimanded for taking records to the meeting; 3) he was transferred to another station; 4) he was denied access to a computer that he needed to perform his job duties as the trainer for on-call firefighters; 5) he was denied use of a department vehicle; 6) he was required to report to a subordinate; 7) all of his keys were taken away from him; and 8) he was denied access to files that he needed to perform his job. That was the first time in Meerschaert's 22 years as a firefighter that he had ever been disciplined.

At some point shortly after being subjected to those disciplinary actions, Meerschaert and the other plaintiffs prepared a flyer addressing their concerns and distributed it to residents of the township. At the next meeting of the township board, on November 13, 2002, Brennan said that he was extremely angry about the flyer.

On November 14, 2002, Meerschaert was the only firefighter on duty in his station when an emergency call came in. The dispatcher did not give a clear address, and as Meerschaert waited for a clarification, two other firefighters arrived at the station. As the superior officer, Meerschaert made the decision that those firefighters would respond to the call while he waited for a clarification of the address, presumably so that he could then relay it to them. Meerschaert claims that the fire department's policy has always been that neither the chief nor the assistant chief is required to respond to every call so long as the call is covered. The defendants claim that Meerschaert shirked his duty because his shift was about to end, and he wanted to be able to leave as soon as it was over so that he could take his wife to a doctor's appointment. Approximately one month after this incident, Meerschaert was informed that he was being suspended for 45 days for his failure to

respond to the emergency call. He considered the suspension to be career-ending, so he decided to resign rather than accept it.

Plaintiff Habel similarly claims that he was subjected to retaliation, including suspension from the fire department, for publicly airing concerns about the fire department and its policies. Like Meerschaert, plaintiff Habel had a good relationship with Ahonen initially. Habel joined the Macomb Township Fire Department as a part-time firefighter in 1982. In 2000 or 2001, Chief Ahonen recommended that he be promoted to lieutenant, and the township board accepted that recommendation. Habel's relationship with Ahonen soured, however, when Habel began to voice concerns about the need for more personnel, stricter enforcement of training requirements, more safety education, and improved response times. He addressed his concerns to Ahonen, Brennan, and Koehs, as well as to the community via the print and broadcast media.

Habel claims that the first instance of retaliation against him occurred when he was not invited to the 20-year employee award ceremony in November of 2002. The next allegedly retaliatory act occurred on January 9, 2003, when Ahonen told Habel to come to his office to discuss a disciplinary action that might be taken against him. The meeting occurred on January 15, 2003, and the subject of the meeting was Habel's public remarks about the fire department. Ahonen warned Habel that he would be punished if he did not stop making derogatory remarks about Ahonen and the department. Because Ahonen refused to tell Habel what derogatory remarks he had allegedly made, Habel asked Ahonen to "take the gloves" off so that they could speak candidly. Ahonen quickly announced that he considered Habel's request to be a personal threat.

The next day, Habel was at the fire station talking to John Martin, another firefighter, when Ahonen arrived. Ahonen interrupted their conversation and refused to return Habel's greeting. After Ahonen finished speaking with Martin, he turned to leave the fire station, and Habel said, "Chief, you drive careful out there." Ahonen apparently interpreted that to be a threat as well because he and his co-defendants filed a police report against Habel for threatening violence against him. Later that evening, Habel was informed that he had been suspended from the Fire Department. He appealed his suspension and was eventually reinstated in October of 2003 following arbitration.

Plaintiff Herczeg alleges that his employment as a firefighter was terminated for voicing his concerns about the fire department. Herczeg was hired in January of 2001 as a probationary firefighter, meaning that he was essentially an at-will employee. He too got along well with Ahonen at the beginning of his employment. In fact, Ahonen told him that he was a good employee and a rising star. Herczeg even received a life-saving award from the fire department. The chief's attitude toward Herczeg changed in the fall of 2002 though. Herczeg claims that their relationship soured partly because he spoke out to other firefighters and a member of the township board about Herczeg's belief that the fire department needed more men and more training. Herczeg also contends that their relationship went downhill because he was known to associate with the individuals who are his co-plaintiffs in this case. In October of 2003, Ahonen informed Herczeg that Ahonen was going to recommend that the township board terminate Herczeg. The board adopted the recommendation, and Herczeg was terminated.

The fourth plaintiff, Smith, asserts that he was subjected to numerous forms of retaliation, such as disciplinary charges and reduced income, because of his decision to speak publicly about problems within the fire department. Smith was hired by the township board as a part-time firefighter in February of 2000 on the recommendation of Chief Ahonen. Smith got along well with Ahonen until 2002, when Smith started to share with the public his concerns about the fire department, which were the same concerns as his co-plaintiffs. From the summer of 2002 until the end of 2003, Smith spoke frequently to citizens and the media about issues within the fire department that had a direct impact on public safety. He also voiced those concerns directly to Ahonen, Brennan, and Koehs.

Smith claims that Ahonen took several measures to silence him, including restricting the number of emergency runs that he could make, shunning and isolating him, and forcing him to request permission to leave a scene from a less senior firefighter. Smith also alleges that Ahonen brought disciplinary charges against him in order to discourage him from speaking. Smith contends that a total of six disciplinary charges were levied against him throughout 2003 and 2004. He was also removed from a platoon role, which caused him to go on fewer runs, and thereby earn less wages. Those actions made Smith fearful of additional retaliation, so he stopped airing his concerns. After he was passed over for a full-time position with the Macomb Township Fire Department, he resigned and accepted a full-time position with another fire department.

In July of 2004, the plaintiffs filed a lawsuit in which they claimed, among other things, that the defendants had violated their First Amendment rights by subjecting them to adverse employment

actions in retaliation for exercising their right to free speech. Because the plaintiffs claim to have been retaliated against as public employees, their speech is protected by the First Amendment only if it addressed a matter of public concern, *see Connick v. Myers*, 461 U.S. 138, 146 (1983), and its value outweighed the government's interest in the orderly and efficient operation of official functions. *See Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will County Ill.*, 391 U.S. 563, 568-69 (1968). Therefore, after extensive discovery, the defendants filed a motion for summary judgment on the ground that a jury could not reasonably conclude that the defendants had retaliated against the plaintiffs in violation of the First Amendment because the plaintiffs had not spoken on a matter of public concern. In the alternative, the defendants asserted that they were entitled to qualified immunity. The district court rejected both of those arguments, finding that the defendants were not entitled to qualified immunity and that there were genuine issues of material fact with respect to whether the defendants had violated the plaintiffs' First Amendment rights. The defendants then filed an interlocutory appeal on the issue of qualified immunity.

The district court properly determined that the defendants are not entitled to qualified immunity. Qualified immunity protects government officials performing discretionary "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Because the plaintiffs spoke on matters of public concern, their speech was protected by the First Amendment. Therefore, any retaliation based on the plaintiffs' speech was a violation of the First Amendment. Furthermore, this court's decision in *Chappel v. Montgomery County Fire Protection*

*Dist. No. 1*, 131 F.3d 564 (6th Cir. 1997), demonstrates that any such violation was a violation of the plaintiffs' clearly established rights. As a result, the defendants are not entitled to qualified immunity.

The plaintiffs' speech constituted speech on a matter of public concern. The plaintiffs all shared their concerns about the fire department's safety and training problems with members of the public. Among other actions, they created a flyer criticizing the safety and training problems of the fire department and circulated it in the community. Such speech addresses a public concern; it is almost identical to speech in *Chappel* that this court held to be protected. *See id*. at 578-79. In *Chappel*, a firefighter/paramedic perceived problems within the fire department on the issues of nepotism, inadequate training, and inadequate standard operating procedures. *See id.* at 568. The plaintiff in that case discussed his concerns privately with the Montgomery County Judge/Executive and other community members, and he also discussed them publicly at meetings of the fire and ambulance boards and the Montgomery County Fiscal Court. *See id*. at 568-69. Like the plaintiff in *Chappel*, the plaintiffs here have engaged in public and private discourse with regard to problems within the fire department that affect public safety. As the *Chappel* court held, speech on matters of public safety is "near the zenith of public concern." *Id.* at 578 (quotations omitted). The issues discussed by the plaintiffs were not just issues of workplace politics, as the defendants claim. Instead, they were issues that had a direct impact on the health and safety of the community. Thus, the plaintiffs' speech in this case touched on a matter of public concern just as the speech at issue in *Chappel* did.

Moreover, the retaliatory acts allegedly taken by the defendants were sufficient to violate the plaintiffs' clearly established rights. Indeed, *Chappel* determined, under almost identical facts, that the defendants had violated the plaintiff's clearly established rights because "[a]ll public officials have been charged with knowing that public employees may not be disciplined for engaging in speech on matters of public concern." *Chappel*, 131 F.3d at 580. Because the issues that were addressed by the plaintiffs' speech in this case were clearly matters of public concern, no reasonable official could dispute that retaliating against the plaintiffs on the basis of their speech was a violation of their constitutional rights. At the very least, the contours of the plaintiffs' rights were sufficiently clear that reasonable officials in the defendants' positions would have understood that their actions amounted to a violation of those rights. *See Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

The defendants have argued extensively that there is no evidence that they actually violated the plaintiffs' rights. Specifically, they argue that the plaintiffs have presented no evidence to prove that any action taken by the defendants was motivated by the plaintiffs' speech. This court has no jurisdiction to hear those arguments in the context of this case because those arguments are essentially factual disputes. *See Johnson v. Jones*, 515 U.S. 304, 319-20 (1995). In an interlocutory appeal of a qualified immunity issue, this court has jurisdiction only to review the separable and abstract issues of law that were determined by the district court's denial of qualified immunity. *See Chappel*, 131 F.3d at 572. In an interlocutory qualified immunity appeal, this court has no jurisdiction to consider issues that involve "nothing more than whether the evidence could support a finding that particular conduct occurred." *Chappel*, 131 F.3d at 572 (quoting *Behrens v. Pelletier*,

- 10 -

516 U.S. 299, 313 (1996)). Accordingly, this court will not address the defendants' fact-based argument that the evidence does not support a finding that the plaintiffs' speech was a motivating factor in the alleged retaliation.

Finally, reversal is not warranted on the basis of defendants' additional contention that Herczeg and Smith never suffered any adverse employment actions. That argument has both legal and factual aspects. Legally, the issue is whether the actions taken against Herczeg and Smith can be considered adverse actions as a matter of law. Factually, the issue is whether those actions ever occurred. The factual issues cannot be considered in this appeal, and the defendants have missed the mark on the legal issue. In their brief, the appellants analyze numerous incidents involving Herczeg and Smith and then conclude that none of those incidents constitute an adverse employment action as a matter of law. With respect to Smith, the nine alleged actions discussed in appellants' brief, plus the six disciplinary actions brought against him in 2003-04 and not so discussed, together are legally sufficient to be considered adverse employment actions for retaliation purposes. With respect to Herczeg, appellants argue that speculation alone connects his termination with protected conduct. This of course is a factual, not a legal, contention.

For the foregoing reasons, we affirm the decision of the district court and remand the case for further proceedings.